**Jessie Ray JONES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 57631.**

Court of Criminal Appeals of Texas, En Banc.

June 21, 1978.

Rehearing En Banc Denied July 19, 1978.

Melvyn Carson Bruder, Dallas, for appellant.

Henry Wade, Dist. Atty., John H. Hagler, and J. Russell Ormesher, Asst. Dist. Attys., Dallas, for the State.

## OPINION

ROBERTS, Judge.

This is an appeal from a conviction for capital murder.[1] The jury answered the three special issues prescribed by Article 37.071(b), Vernon's Ann.C.C.P., in the affirmative; accordingly, punishment was imposed at death.

The appellant contends that he was unlawfully arrested and therefore that the trial judge improperly allowed into evidence the fruits of that arrest, that the trial judge improperly allowed into evidence an extraneous offense, and that the trial judge erred by overruling the appellant's motion for mistrial when the prosecutor argued his personal feelings at the punishment stage of the trial. We affirm.

The evidence reveals that on January 8, 1974, Ricardo Sisto was working as a used car salesman at J & M Motors in Dallas. Sometime during the day, he sold a 1967 yellow Chevrolet to the appellant.

At approximately 9:59 a. m. on the morning of January 15, 1974, Officer Bill Slack of the Dallas Police Department received a call over his police radio to proceed to the

---

1. V.T.C.A., Penal Code, Section 19.03(a)(2).

E–Z Way Grocery located at 5376 Second Avenue in Dallas. When Slack arrived, he encountered Officer Michael Warren of the Dallas Police Department. Inside the store, behind the check-out counter, they found the body of the deceased, William Cain. The officers also noticed that the cash register was open and that no money was inside it. Immediately to the left of the cash register the officers found a brown paper sack which contained a cold can of Schlitz beer. Outside the grocery they found a trail of quarter-sized blood drops that led across the parking lot and into a gulley that ran underneath Second Avenue.

The investigation of the murder and apparent robbery revealed that $871.39 and two radios were taken from the store, while the deceased's watch—a "Paul Raynard" with a new "Twist-o-Flex" band attached—and personal radio were also taken. Two fingerprints—the left ring finger and left middle finger—were "lifted" from the Schlitz beer can.

On January 21, 1974, at approximately 12:50 p. m., two men driving a yellow 1967 Chevrolet pulled up to Al's Grocery at 3606 Lamar in Dallas. The two men went into the store. One man, subsequently identified as the appellant, went to the vault cooler and looked inside while the other man stopped at the check-out stand and ordered a salami sandwich. Al Binley, the owner of the store, made the appellant's companion a sandwich. At that point in time, one of Binley's employees, Verdie Lee Sterling, gathered her belongings and started to leave the store. The appellant's companion paid for the sandwich and, together with the appellant, they followed Sterling out of the grocery. Sterling saw the men get into the 1967 yellow Chevrolet.

Approximately five minutes later, Binley, who was alone in the store, noticed that the appellant and his companion reentered the store. The appellant's companion told Binley that he wanted another sandwich while the appellant walked to the vault cooler. After Binley made the appellant's companion a sandwich, the appellant approached the check-out counter and asked for a pack of Winston cigarettes. Binley laid the cigarettes on the counter and told the appellant that they were 55 cents. The appellant said, "Put them back and I will get a can of beer." The appellant went to the cooler, got out a can of Schlitz, walked back to the counter and placed the Schlitz can on the counter to the left of the cash register.

The appellant then reached for what Binley believed to be a wallet, but the appellant pulled out a chrome-plated pistol with a "pitted place down below the cylinder" on the right-hand side of it, pointed it directly at Binley's forehead and pulled the trigger. The pistol did not fire.

Before the appellant could pull the trigger again, Binley attempted to disarm him. While Binley and the appellant struggled for control of the gun, it discharged into the ceiling. Binley ran down an aisle and started to "bombard him [the appellant] with all of the canned goods and everything I could lay my hands on."

The appellant fired a second shot at Binley which struck him in the forehead, spun him around, and knocked him down. Binley, who was semi-unconscious, played "dead." Someone jerked off his wrist watch and searched his pockets. The appellant and his companion also took two cartons of Winston cigarettes, a .38 caliber Smith and Wesson revolver, and the contents of the cash register.

After the appellant and his companion left the store, some children entered it, saw Binley and screamed. When the police arrived they found the unopened can of Schlitz on the counter and what appeared to be a bullet hole in the ceiling.

The investigation of the attempted murder and robbery at Al's Grocery yielded a bullet from the ceiling, and two fingerprints—the right middle finger and right index finger—were "lifted" from the Schlitz beer can.

On February 6, 1974, Officer D. M. Hickman of the Dallas Police Department executed an affidavit for an arrest warrant for

the appellant.[2] The affidavit was presented to Judge Robert Cole who issued an arrest warrant on February 6, 1974.

Approximately four hours after the arrest warrant was issued, numerous officers of the Dallas Police Department converged on a house at 519 East 12th in Dallas. A yellow 1967 Chevrolet was parked approximately forty feet away.

Officers Tom Sewell, George Thomason, Marvin Johnson and Lieutenant A. M. Eberhardt, among others, approached the front of the house. They noted that there were three doors on the front porch and together they approached the left door. Sewell, who was closest to the left door, started to move a garbage can to gain entrance, but just as he did, he heard "breaking glass" and an officer yelling for someone to get back inside. He also heard footsteps in the house. Accordingly, Sewell kicked the door down and started to enter the house. He encountered a stairway, and then realized that he was not at the appellant's door.

The officers then went to the middle door and kicked it open. Johnson, Sewell and Thomason ran through the door into the living room—where they saw a woman—down a hallway, through the kitchen and into a bedroom which led to an adjoining bathroom. Sewell, Johnson and Thomason located the appellant in the bathroom and they yelled to Eberhardt, who had remained with the woman, that "He is in the bathtub."

Sewell, Johnson and Thomason arrested the appellant and had him get out of the bathtub. As they marched the appellant from the bathroom into the bedroom, Sewell noticed the butt of a chrome-plated pistol protruding from underneath a stack of towels on a linen shelf. After the officer had handcuffed the appellant and started to dress him, Sewell seized the pistol. A number of other officers had entered the bedroom while the appellant was being dressed

and one of them, Officer Wilson, saw a radio and seized it. Thomason seized a watch from a shelf above the washstand in the bathroom and a watch from the top of a dresser in the bedroom.

At trial, one of the watches seized was identified by Binley as the one taken during the robbery at his store, while the other watch was identified by Mrs. Cain and William Barry as Cain's watch. The radio seized at the appellant's residence was also identified as Cain's. The pistol seized in the search was positively linked to the bullet found in the ceiling at Al's Grocery, but the bullet removed from Cain's head was mutilated to the point where it could not be positively linked to that particular gun.[3] Binley identified the gun as the one the appellant had during the robbery. The fingerprints "lifted" from the Schlitz cans seized at both stores were positively identified as the appellant's. The appellant's brother—James Lovers Jones—directed the police to a gun located in some bushes near the appellant's apartment. The gun was identified as the gun stolen from Binley.

The appellant presented no evidence at either the guilt or innocence or the punishment stages of the trial.

The appellant's first contention is that the arrest warrant was invalid because it failed to comply with Article 15.02, Vernon's Ann.C.C.P., which states:

"It issues in the name of 'The State of Texas', and shall be sufficient, without regard to form, if it have these substantial requisites:

"1. It must specify the name of the person whose arrest is ordered, if it be known, if unknown, then some reasonably definite description must be given of him.

"2. It must state that the person is accused of some offense against the laws of the State, naming the offense.

---

2. The affidavit was based on facts connected with the attempted murder and robbery of Binley.

3. The ballistics expert testified that the bullet which killed Cain was a .38 caliber and that it was fired from either a Colt or a Miraca. The pistol seized at the appellant's apartment was a Colt .38.

"3. It must be signed by the magistrate, and his office be named in the body of the warrant, or in connection with his signature."

The arrest warrant states, in pertinent part, the following:

```
"WARRANT OF ARREST
IN THE JUSTICE'S COURT THE STATE OF TEXAS
Precinct No. 1, Place No. 1
Dallas County, Texas

TO ANY SHERIFF, CONSTABLE OR PEACE OFFICER OF
THE STATE OF TEXAS-
GREETINGS:

YOU ARE HEREBY COMMANDED TO ARREST

 JESSIE RAY JONES

If to be found in your County and bring before
me, ROBERT R. COLE, a Justice of the Peace, in
and for Precinct NO. 1, of Dallas County, Texas
at my office located at Room NO. G-106, Court-
house, in Dallas, Texas, in said Dallas County,
Texas, --INSTANTER--then and there to answer THE
STATE OF TEXAS for an offense against the laws
of said State, to-wit: A FELONY;

 AG. ROB. SER. INJ.

Of which offense the said, JESSIE RAY JONES

is accused by the written complaint
of UNKNOWN COLORED MALE

and under the oath of D. M. HICKMAN, DPD
 filed before me.

Date of Offense JANUARY 21, 1974

Date Complaint Filed FEBRUARY 6, 1974

Warrant of Arrest Issued To D. M. HICKMAN, DPD

HEREIN FAIL NOT but of this writ make due return,
showing how you have so executed the same.

WITNESS MY OFFICIAL SIGNATURE, this FEBRUARY 6, 1974.

 /s/ Robert R. Cole
 ROBERT R. COLE
 JUSTICE OF THE PEACE
 IN THE JUSTICE'S COURT
 PRECINCT NO. 1 PLACE NO. 1
 DALLAS COUNTY, TEXAS"
```

■ The appellant contends that "AG. ROB. SER. INJ." does not state an offense under the laws of Texas. The State, on the other hand, contends that the foregoing clearly refers to the offense of aggravated robbery and further points out that Article 15.02, Vernon's Ann.C.C.P., specifically states that the warrant is not dependent on "form."

The appellant relies upon *Fulkerson v. State*, 43 Tex.Cr.R. 587, 67 S.W. 502 (1902). In *Fulkerson*, the defendant filed a motion to quash the information because the warrant of arrest set out in the information failed to show that the defendant was accused of an offense under the laws of Texas. The arrest warrant stated that the defendant was "accused of the offense of gaming." The defendant relied on Article 254 of the 1895 Code of Criminal Procedure, which stated: [4]

"Art. 254. [233] It issues in the name of 'The State of Texas,' and shall be deemed sufficient, without regard to form, if it have these substantial requisites:

"1. It must specify the name of the person whose arrest is ordered, if it be known; if not known, then some reasonably definite description must be given of him.

"2. It must state that the person is accused of some offense against the laws of the state, naming the offense.

"3. It must be signed by the magistrate, and his office be named in the body of the warrant, or in connection with his signature."

The Court held that "[g]aming, eo nomine, is not an offense under our law" and held that the trial judge should have granted the motion to quash.

However, the opinion fails to make note of the fact that Chapters 3, 4 and 5 of the 1895 Penal Code [5] proscribed a number of specific offenses involving different types of gaming. For instance, Chapter 3 of the 1895 Penal Code, which was entitled "Gaming," was comprised of thirteen specific sections.[6] Section 394, Chapter 4, 1895 Penal Code, was entitled " 'Offense against gaming laws' defined." It provided, in part, that the term "offense against the gaming laws" . . . "meant any offense within the provisions of chapter three" of the 1895 Penal Code. Finally, Chapter 5 of the 1895 Penal Code proscribed betting on elections.

Thus, it is clear that the allegation in the information involved in *Fulkerson*—that the defendant was "accused of the offense of gaming"—did not name any offense with which the defendant was charged. Rather, the allegation referred to a type or class of offense. Therefore, the arrest warrant did not comply with Article 254(2) of the 1895 Code of Criminal Procedure.

4. See Acts 1895, 24th Leg., Section 2, ch. 82.

5. See Acts 1895, 24th Leg., Section 1, ch. 82.

6. Sections 379–391, Penal Code of 1895.

Under our decision in *Fulkerson,* Article 254(2) required that a defendant be given *notice* of an offense with which he was charged. See also *Sullivan v. State,* 67 Tex.Cr.R. 113, 148 S.W. 1091 (1912).

In *Ellis v. Glascow,* 168 S.W.2d 946 (Tex. Civ.App.—San Antonio 1943, no writ), the Court of Civil Appeals dealt with Article 219 of the 1925 Code of Criminal Procedure.[7] In *Ellis,* the Court was forced to decide whether an arrest and detention of one Chama Lacy constituted false imprisonment. That, in turn, depended on the validity of the warrant with which Lacy was arrested. The warrant therein provided, in part, that

> " 'You are hereby commanded to arrest Chama Lacy * * * and bring him before me * * * at my office * * then and there to answer * * * for an offense against the laws of said State, to-wit: obtaining board and lodging by trick.' "

The Court adopted as part of its opinion a tentative opinion of Associate Justice Sutton which stated:

> " 'There is no question but that the warrant complies fully with the statute, unless it is defective in the matter of naming the offense in the language underscored above. The complaint is that it omits two elements of the offense—that he obtained board and lodging from a hotel or boarding house and failed to pay therefor. The prosecution is under Art. 1551, P.C.
>
> " 'The statute merely requires the warrant "name" the offense. It neither requires that it be defined nor that the elements be given. A warrant is process and not a pleading. The warrant as process is issued by clerks and magistrates. They are usually unlearned and untrained in the law and have no familiarity with the technicalities of pleading. The matter of pleading an offense by complaint, information and indictment is for the county or district attorney. If the war-

rant must define or name the elements of the offense then there could be no reason for naming it.

> " 'Undoubtedly the purpose for naming the offense is to merely advise the accused he is charged with some particular offense—obtaining board and lodging by trick, and not murder, etc. * * *
>
> " 'If the warrant must give the elements of the offense or define it, then no arresting officer could ever safely serve one without first consulting a competent lawyer, and could not then ever feel secure against a civil suit for damages. The effect would be to seriously handicap law enforcement officers and render more difficult the enforcement of the criminal laws. Unless a clear duty calls for such course then it ought not be pursued.' "

The Court held that the warrant was not defective. There, however, unlike the situation in *Fulkerson,* only one offense of obtaining board and lodging by trick was proscribed by the penal statute.

Article 15.02, Vernon's Ann.C.C.P., is substantially identical to Article 254 of the 1895 Code of Criminal Procedure and Article 219 of the 1925 Code of Criminal Procedure. Thus, what this Court said in *Fulkerson* and what the Court of Civil Appeals said in *Ellis* are applicable to the present case.

The essential question is whether the letters "AG. ROB. SER. INJ." provided notice to the appellant that he was charged with an offense. Too, this question must be resolved in light of the language of Article 15.02, Vernon's Ann.C.C.P., that the warrant "shall be sufficient, without regard to form, if it have these substantial requisites . . . ."

The foregoing language convinces us that the letters "AG. ROB. SER. INJ.", which obviously represent the offense of aggravated robbery under V.T.C.A., Penal Code, Section 29.03(a)(1),[8] are sufficient, particu-

---

7. Article 219 of the 1925 Code of Criminal Procedure, with the exception of one comma, was identical to Article 15.02, Vernon's Ann.C. C.P. See Acts 1924, 39th Leg., Section 2, ch. 2.

8. V.T.C.A., Penal Code, Section 29.03(a) states:
 "(a) A person commits an offense if he commits robbery as defined in Section 29.02 of this code, and he:

larly in the absence of a motion to quash, pretrial objection, or trial objection, to have complied with the purpose of Article 15.02, Vernon's Ann.C.C.P. We hold that the arrest warrant sufficiently named an offense with which the appellant was charged. Appellant's first contention is overruled.

The appellant's second contention is that the arrest warrant was not supported by probable cause and that the evidence seized pursuant to the arrest was inadmissible. The affidavit which was presented to Judge Cole by Officer D. M. Hickman, the affiant, stated, in pertinent part, that:

"PERSONALLY APPEARED before me the undersigned authority this affiant, who after being by me duly sworn, deposes and says your Affiant has good reason to believe and does believe that one JESSIE RAY JONES hereinafter styled Defendant, on or about the 21st day of January in the year of our Lord One Thousand Nine Hundred and Seventy-four in the County and State aforesaid, did unlawfully, then and there, while in the course of committing theft of thirty dollars in U.S. currency, hereinafter called 'the property,' from ALBERT L. BINLEY, with intent to obtain and maintain control of the property, did use and exhibit a deadly weapon, namely: a handgun, and did knowingly and intentionally cause serious bodily injury to Albert L. Binley.

"Affiant states that on January 21, 1974, at approximately 1:00 P.M., Albert L. Binley, the owner and operator of Al's Grocery & Market located at 3606 South Lamar, Dallas, Dallas County, Texas, was shot in the head and robbed of approximately $30. That said attack took place at said business location.

"Affiant has personally interviewed the complaining witness, Albert L. Binley, who advised affiant that the person who robbed and shot him placed a can of beer on the check-out counter near the cash register. Complainant Binley stated that said person then pulled a pistol from his pocket, shot him in the head and took approximately $30 from the cash register. Complainant Binley further stated that his attacker was a colored male in his mid to late twenties.

"Affiant has personal knowledge that during the investigation of said robbery and shooting, a beer can was recovered from the counter where Binley stated his attacker had left same. Fingerprints were lifted from said beer can and compared with the known fingerprints of Jessie Ray Jones and found to be identical. "Jessie Ray Jones is known to affiant to be a colored male, 30 years of age."

The appellant complains of the sentence, "Fingerprints were lifted from said beer can and compared with the known fingerprints of Jessie Ray Jones and found to be identical." The appellant's complaint is that, "It cannot be determined how the complaining witness learned of such facts."

 It is well established that an affidavit in support of either an arrest warrant or a search warrant must provide the magistrate with "sufficient information to support an independent judgment that probable cause exists for the warrant." *Whiteley v. Warden of Wyoming Penitentiary*, 401 U.S. 560, 564, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The information with which the magistrate may be supplied may be either the "direct personal observations of the affiant," *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), or hearsay information. *Aguilar v. Texas*, supra; *Jones v. United States*, supra. Where hearsay information is supplied to an affiant by an informant, the affidavit must contain underlying circumstances from which the informant con-

---

(1) causes serious bodily injury to another; or

(2) uses or exhibits a deadly weapon."
There are two forms of aggravated robbery.

We note that the arrest warrant specified Section 29.03(a)(1), V.T.C.A., Penal Code.

cluded that a crime had been committed and some of the underlying circumstances from which the affiant concluded that the informant was credible or his information reliable.

■ Our determination of the sufficiency of an arrest or search warrant affidavit's statement of probable cause is limited to the four corners of the affidavit. *Oubre v. State*, 542 S.W.2d 875 (Tex.Cr.App.1976); *Lopez v. State*, 535 S.W.2d 643 (Tex.Cr.App.1976). However, we interpret affidavits for arrest or search warrants in a common sense and realistic manner, *Lopez v. State*, supra; *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), and the magistrate who reviews an affidavit may draw inferences from the facts contained in it. *Lopez v. State*, supra; *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

■ The affidavit is divided into five distinct paragraphs. The appellant's sole complaint is directed at the second sentence of the fourth paragraph. The first sentence of the fourth paragraph begins with the phrase, "Affiant has personal knowledge." Interpreting the fourth paragraph in a common sense and realistic manner, we hold that the magistrate could have inferred that the second sentence of the fourth paragraph—"Fingerprints were lifted from said beer can and compared with the known fingerprints of Jessie Ray Jones and found to be identical"—was information within the personal knowledge of the affiant.[9] We therefore hold that the affidavit, which is obviously based on the statements of the victim of an offense to the affiant, as well as the affiant's personal knowledge of that offense as an investigating officer thereof, was sufficient to have afforded the magistrate with a basis for an independent determination of probable cause.[10] Appellant's second contention is overruled.[11]

9. The appellant points out that the testimony at the suppression hearing and the trial reveals that the affiant learned that the fingerprints from the Schlitz cans had been compared with the appellant's fingerprints by Detective Bass of the Dallas Police Department. We cannot consider this fact as affecting the magistrate's determination of probable cause under our decisions in *Oubre v. State*, supra, and *Lopez v. State*, supra.

10. The appellant's reliance on *Lowery v. State*, 499 S.W.2d 160 (Tex.Cr.App.1973), is misplaced. In *Lowery*, the Court was confronted with the following affidavit:

"'Affiant has reliable information from an informant that Jackie Vance Lowery did commit the offense of armed robbery and murder of Morris J. Patterson on the 26th day of October, 1970 at approximately 5:40 P.M. Mr. Barney Slakey has positively identified a picture of Jackie Vance Lowery at 9:05 P. M. on the 28th day of October, 1970 as the person who committed the offense of armed robbery and murder of Morris J. Patterson. The offense occurred at 1119 Wayne Street at the City Cigarette Service Office.'"
*Id.* at 162.
We there noted that the first sentence of the affidavit was hearsay which failed to satisfy either of the two prongs of *Aguilar v. Texas*, supra. We then noted that a "hearsay affidavit, otherwise insufficient under *Aguilar*, may be buttressed with corroborating facts," . . . but further noted that the "facts recited for corroboration purposes must, however, be based upon personal knowledge of or observations by the affiant." *Id.* at 163. We went on to conclude that the second sentence of that affidavit—"Barney Slakey has positively identified a picture of Jackie Vance Lowery as the person who committed the offense of armed robbery and murder of Morris J. Patterson"—"does not provide the necessary information that the identification was made in the affiant's presence . . . nor that Slakey was a person known to affiant as an eyewitness to the robbery-murder who could therefore identify the offender." *Id.* at 163.
We therefore held that since the corroborating facts were not qualified as the personal knowledge of the affiant, the magistrate could not have found probable cause.
In the present case, unlike *Lowery*, the affidavit does contain statements within the personal knowledge of the affiant. Indeed, the fourth paragraph of the affidavit in the present case is qualified as being within the affiant's personal knowledge. Finally, the affidavit in *Lowery* was based on the "reliable information from an informant," while the affidavit in the present case is based on the affiant's personal knowledge as an investigating officer and upon statements from Binley, the victim of the offense. We hold that *Lowery* is not applicable to the present case.

11. We also note that although the appellant filed a motion to suppress some of the items seized at his apartment when he was arrested, he did not complain that the arrest warrant was not supported by probable cause. See

■ The appellant's third contention is that a .38 caliber pistol, two watches, and a radio seized in the appellant's apartment when he was arrested were illegally seized and hence the admission of those items into evidence at the trial was error. The appellant asserts that the seizure of these items was outside the limits of a search incidental to a lawful arrest and that the seizure of the items was not justified under the "plain view" doctrine.

The items seized—a .38 caliber pistol, two watches, and a radio—were seized within minutes of the appellant's arrest. Officer Sewell testified he saw the butt of a chrome-plated pistol protruding from underneath some towels on a linen shelf. He seized the pistol as soon as the appellant had been handcuffed in the bedroom. The testimony pertaining to the seizures of the two watches and the radio at the suppression hearing and at trial is somewhat conflicting. However, the record reflects that while the appellant was being dressed Officer Wilson entered the bedroom and saw a radio sitting on the head of the bed. Based on information he obtained during the investigation of the Cain murder-robbery, Wilson believed the radio to be Cain's and seized it. Prior to the time when the appellant was removed from the apartment, Officer Thomason seized a watch on the dresser in the bedroom where the appellant was dressed and a watch on a shelf above the washstand in the bathroom where the appellant was seized. Both watches were in plain view.

In *Chimel v. California*, 395 U.S. 752, 762–763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969), the Supreme Court discussed at length the "search incident to arrest" principle, and stated:

"When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

"There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less."

The appellant was seized in the bathroom and taken out of the bathroom by the only exit thereto. That exit led to a bedroom where the appellant was handcuffed and dressed. All of the items were seized in the bathroom, in the exit passage from the bedroom, or the bedroom itself. We are unwilling to conclude that the search exceeded the area within the appellant's immediate reach at or during the arrest. *Cf. Tarpley v. State*, 565 S.W.2d 525 (Tex.Cr.App.1978) (delivered May 10, 1978).

■ Moreover, even if the seizure of the items was not justified under the "search incident to arrest" principle, the items were properly seizable under the "plain view"

---

*Reynolds v. State*, 506 S.W.2d 864 (Tex.Cr.App. 1974). At trial, the appellant's objections to the introduction of the evidence seized likewise failed to address the ground of error he has raised on appeal.

doctrine exception to the warrant requirement of the Fourth Amendment. In *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 22 L.Ed.2d 564 (1971), the Supreme Court addressed the "plain view" doctrine and stated:

"What the 'plain view' cases have in common is that the police officer in each of them had a *prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused.* The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, *search incident to lawful arrest,* or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." (Emphasis added)

The arrest warrant clearly authorized the officer's entry into the appellant's apartment to arrest him. The appellant was arrested in the bathroom, taken through the exit thereof, and into the adjoining bedroom. The officer's initial intrusion into each of these areas was justified. The items seized were in "plain view" in these areas. The "plain view" doctrine was not used by the police "to extend a general exploratory search from one object to another until something incriminating at last emerge[d]." *Id.* The appellant's third contention is overruled.

■ The appellant's fourth contention is that his arrest was effectuated in violation of Articles 15.25 and 15.26, Vernon's Ann.C.C.P., which state:

"Art. 15.25. May Break Door

"In case of felony, the officer may break down the door of any house for the purpose of making an arrest, if he be refused admittance after giving notice of his authority and purpose."

"Art. 15.26. Authority to Arrest Must be Made Known

"In executing a warrant of arrest, it shall always be made known to the accused under what authority the arrest is made. The warrant shall be executed by the arrest of the defendant. The officer need not have the warrant in his possession at the time of the arrest, provided the warrant was issued under the provisions of this Code, but upon request he shall show the warrant to the defendant as soon as possible. If the officer does not have the warrant in his possession at the time of arrest he shall then inform the defendant of the offense charged and of the fact that a warrant has been issued."

The appellant contends that since the record reveals that the arresting officers failed to comply with Articles 15.25 and 15.26, Vernon's Ann.C.C.P., the arrest was illegal and hence the evidence seized—a .38 caliber chrome-plated pistol, two watches, and a radio—was inadmissible at trial pursuant to Article 38.23, Vernon's Ann.C.C.P.

The appellant's contention is one of first impression. We agree with the appellant that the record reflects that the officers did not comply with Article 15.25 and the first sentence of Article 15.26, Vernon's Ann.C.C.P. However, we disagree with the appellant that non-compliance with Articles 15.25 and 15.26, Vernon's Ann.C.C.P., renders an arrest illegal.

Articles 15.25 and 15.26, Vernon's Ann.C.C.P., deal with the execution of arrest warrants. A similar statute—Article 18.06(b), Vernon's Ann.C.C.P. [Formerly Article 18.16, Vernon's Ann.C.C.P.]—deals with the execution of search warrants. Article 18.06(b), Vernon's Ann.C.C.P., states that:

"(b) The officer shall, upon going to the place ordered to be searched or before seizing any property for which he is ordered to make the search, *give notice of his purpose* to the person who has charge of or is an inmate of the place or who has possession of the property described in the warrant." (Emphasis added).

It is well established that the failure to comply with old Article 18.16, Vernon's Ann.C.C.P. [now Article 18.06(b), Vernon's Ann.C.C.P.], does not render a search illegal. *Barnes v. State*, 504 S.W.2d 450 (Tex. Cr.App.1974); *Smith v. State*, 491 S.W.2d 924 (Tex.Cr.App.1973). We can perceive of no reason why non-compliance with the formal requisites of an arrest—Article 15.25 and 15.26, Vernon's Ann.C.C.P.—should render illegal that arrest when non-compliance with the formal requisites of a search—Article 18.06(b), Vernon's Ann.C.C.P.—does not render illegal that search. We therefore hold that the non-compliance with Article 15.25 and 15.26, Vernon's Ann.C.C.P., does not render an arrest illegal. Appellant's fourth contention is overruled.

The appellant's fifth contention is that the State should not have been allowed to introduce testimony concerning the attempted murder and robbery of Albert Binley during the guilt or innocence stage of the trial. The appellant contends that since the defense rested with the State, put on no evidence, and raised no defensive theories, the admission of the extraneous offense during the State's *direct* case was error. It is a well established proposition that

"... an accused is entitled to be tried on the accusation made in the state's pleading and that he should not be tried for some collateral crime or for being a criminal generally. [Citations omitted] Evidence of other crimes committed by the accused may be admitted, however, where such evidence is shown to be both material and relevant to a *contested issue* in the case." [Citations omitted] *Albrecht v. State*, 486 S.W.2d 97, 100 (Tex.Cr.App.1972). (Emphasis added).

The essential question, therefore, is whether there was a contested issue, and if so, whether the extraneous offense was material and relevant to it.

The appellant relies upon *Redd v. State*, 522 S.W.2d 890 (Tex.Cr.App.1975) to demonstrate that identity was not a contested issue. In *Redd*, the defendant rested with the State, put on no evidence, and raised no defensive theories. We there held that the admission of extraneous offenses during the State's *direct* case was error.

In *Redd*, the defendant was charged with robbery by assault. Although the defendant was positively identified by four witnesses, the State introduced two extraneous offenses. There, the State contended that the issue of identity was raised by the defendant's cross-examination of one of the State's eyewitnesses. We there held that the defendant's cross-examination of one of the State's four eyewitnesses did not raise the issue of identity so as to permit the admission of the extraneous offenses.

In the present case, the State asserts that since the prosecution was based entirely on circumstantial evidence, *Hinkle v. State*, 442 S.W.2d 728 (Tex.Cr.App.1968) is dispositive of the appellant's contention.

In *Hinkle*, the defendant was charged with murder with malice. The evidence revealed that the deceased, a police officer, had seen a brown 1965 Pontiac run a stop sign. The deceased was seen driving on his motorcycle after the Pontiac. Shortly thereafter, shots were heard from the direction in which the deceased had gone after the Pontiac. A brown Pontiac was seen leaving the area where the deceased was found shot. Additional evidence placed the defendant in the 1965 brown Pontiac while he was in Galveston and Houston during the days immediately before the shooting.

The State there introduced evidence that the 1965 brown Pontiac had been stolen in Little Rock, Arkansas, fourteen days prior to the shooting. The State also introduced evidence that the bullet which killed the deceased was fired from the same gun which fired a bullet into a cabinet in Little Rock, Arkansas during a robbery committed by the defendant and his brother thirteen days before the shooting. The defendant's brother was shown to be in possession of the gun during the Little Rock robbery.

In *Hinkle*, we noted that the appellant did not testify or call any witnesses in his behalf. We there held that the extraneous

offenses were admissible to establish identity and motive.

Thus, *Hinkle* stands for the proposition that where identity is established only by circumstantial evidence, extraneous offenses are admissible on the issue of identity. *Redd*, on the other hand, established the proposition that attempted impeachment of direct evidence of identity—cross-examination of eyewitnesses—will not necessarily raise the issue of identity.

Thus, the admissibility of the extraneous offense in the present case depends upon the evidence relating to identity adduced by the State.

The record reflects that a Schlitz beer can was found on the counter of the E–Z Way Grocery. The appellant's fingerprints were "lifted" therefrom. There were no eyewitnesses to the murder of Cain. The bullet removed from Cain's head was not even affirmatively linked to the appellant's Colt pistol. A trail of blood spots was found which was not consistent with either the deceased's or the appellant's blood type. The deceased's radio and watch were seized at the appellant's apartment.

In *Crawford v. State*, 502 S.W.2d 768 (Tex.Cr.App.1973), we noted that direct evidence is that evidence which directly demonstrates the main fact to be proved: Circumstantial evidence, on the other hand, is that evidence which directly demonstrates a secondary fact which, by logical inference, demonstrates the main fact. See also *Eiland v. State*, 509 S.W.2d 596 (Tex.Cr.App. 1974). The main fact to be proved was that the appellant fired the bullet which killed the deceased into the deceased's forehead. None of the evidence connected with the murder directly demonstrates the main fact.

The fingerprints that were "lifted" from the cold Schlitz beer can proved that the appellant handled the beer can sometime during the morning of the murder, but prior to the time when the police arrived. They did not prove that the appellant fired the bullet which killed the deceased.

The bullet which was removed from the deceased's head could have been fired from the deceased's pistol. However, there was no affirmative ballistic testimony positively linking the gun to the appellant. Moreover, even if there had been a positive link between the bullet removed from Cain's head and the appellant's pistol, this could not have been direct evidence that the appellant fired the pistol, only that the appellant had possession of the murder weapon at the time he was arrested.

Also, the trail of blood found outside the store was not connected with either the deceased or the appellant. It constituted circumstantial evidence that sometime during the morning of the offense, someone other than the deceased or the appellant was injured at the store.

Finally, the appellant's possession of the deceased's radio and watch is obviously direct evidence that the appellant had in his possession the deceased's radio and watch. However, it is only circumstantial evidence that the appellant was a party to the robbery and murder.

We cannot conclude that there was any direct evidence that the appellant committed the offense.[12] *Cf. Edwards v. State*, 561 S.W.2d 834 (Tex.Cr.App.1977); *Eiland v. State*, supra. Thus, we hold that the issue of identity was contested and that evidence of the extraneous offense was admissible on the issue of identity. There

---

**12.** The appellant, relying on *McGarry v. State*, 82 Tex.Cr.R. 597, 200 S.W. 527 (1918), contends that the presence of the appellant's fingerprints at the scene of the offense and the appellant's possession of the deceased's radio and watch were sufficient to remove the case from the "realm of circumstantial evidence." However, *McGarry* is not in point. In *McGarry*, the appellant was not found to be in possession of stolen property. The Court reversed the conviction on the ground that the evidence was insufficient to show a burglary because, although the appellant's fingerprints were found on a broken window, there was evidence that the window was accessible to the general public. Thus, *McGarry* is consistent with *Bowen v. State*, 460 S.W.2d 421 (Tex.Cr.App.1970), in which we held that fingerprints found at the scene of a burglary, without a showing that they must have necessarily been made at the time of the burglary, were insufficient circumstantial evidence to sustain a conviction.

were sufficient distinguishing characteristics common to both the extraneous offense and the offense for which the appellant was on trial to have justified the introduction of the extraneous offense. *Ford v. State*, 484 S.W.2d 727 (Tex.Cr.App.1972). We also hold that the extraneous offense was material and relevant to the issue of identity. Appellant's fifth contention is overruled.

The appellant's sixth contention is that the trial judge erred by failing to grant the appellant's motion for mistrial when, at the punishment stage of the trial, the prosecutor stated that:

"Each of you are faced with a duty. Mr. Halsey [Defense Attorney] said something about, 'Well, Mr. Ormesher is hired to come down here and do his job.' They don't pay me enough to come down here and stand in front of you people and ask you to do something that I couldn't do myself.

[DEFENSE ATTORNEY]: "Judge, I am going to object.

THE COURT: "Sustain the objection. Disregard that, Ladies and Gentlemen.

[DEFENSE ATTORNEY]: "We will ask for a mistrial.

THE COURT: "Overrule your motion for a mistrial."

The appellant relies upon *Clayton v. State*, 502 S.W.2d 755 (Tex.Cr.App.1975). In *Clayton*, the prosecutor argued at the conclusion of the guilt or innocence stage of the trial that:

"*I tell you one thing: Mr. Wade pays my salary. It's not very much. He couldn't pay me enough to come down here and prosecute a man I didn't know in my heart to be guilty. They have talked to you —*" (Emphasis in original)

We reversed the judgment in *Clayton* on the basis of the foregoing argument. However, the argument in *Clayton* was at the guilt or innocence stage *and* the trial judge overruled the objection.

In the present case, the argument was at the punishment stage *and* an instruction to disregard was given. Normally, an instruction to disregard will cure any error or render the error harmless. *Hughes v. State*, 563 S.W.2d 581 (Tex.Cr. App.1978) and cases cited therein. Moreover, unlike the argument in *Clayton*, we do not agree that the prosecutor was arguing "his personal feelings." Of course, it is never proper for a prosecutor to imply to the jury that he knows about evidence of a defendant's guilt which has not been presented to a jury, but the instant argument does not convey any such implication and the jury could not have inferred any such inference therefrom.

The judgment is affirmed.