Genene JONES, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–84–00461–CR.

Court of Appeals of Texas,
San Antonio.

May 25, 1988.

David R. Weiner, San Antonio, for appellant.

Fred G. Rodriguez, Raymond Fuchs, C.N. Rothe, Edward Shaughnessy, III, Criminal Dist. Attys., San Antonio, for appellee.

## OPINION

Before CADENA, C.J., and DIAL and CHAPA, JJ.

DIAL, Justice.

The defendant Genene Jones was found guilty in a non-jury trial of the offense of injury to a child, TEX.PENAL CODE ANN. § 22.04(a)(1) (Vernon 1987). Punishment was assessed at 60 years' confinement. Appellant alleges three points of error related to the admission of evidence of extraneous offenses or misconduct and one ground of error alleging insufficiency of the evidence to support the verdict. We overrule the points of error and affirm the conviction.

The portion of the indictment for which the defendant was convicted reads as follows:

9TH day of JANUARY, A.D., 1982, GENENE JONES, the defendant, did then and there intentionally and knowingly cause serious bodily injury to ROLANDO SANTOS, hereinafter called the complainant, a child younger than fourteen (14) years of age, by intentionally and knowingly engaging in conduct, namely: THE ACT OF INJECTING THE COMPLAINANT WITH HEPARIN SODIUM;

[1]Jones had been a nurse in the Pediatric Intensive Care Unit (PICU) at the Medical Center Hospital in San Antonio. Eighty-two patients had died in the PICU from January 1979 through June 1982. This was deemed to be an unusual increase in mortality. Dr. Gregory Istre, an epidemiologist, was asked by the Center for Disease Control to investigate the infant deaths at Medical Center Hospital. The admission into evidence of Dr. Istre's testimony and the report that he prepared was objected to by the defense and constitutes the basis for the first two points of error. The trial court gave the defense a running objection to the evidence and permitted the State to develop it, stating that he would ignore it if the State did not show its relevance and admissibility.

Dr. Istre testified that he had reviewed the charts of the 82 PICU patients who died during the period in question. He also reviewed the occurrence of cardiopulmonary resuscitation events (CPR) in the hospital during the same period. He also reviewed the work schedules for each PICU nurse and other persons whose names appeared on the patients' charts. The investigation revealed a disproportionate number of deaths occurring on the evening shift in the second, third, and fourth quarters of 1981, and the first and second quarters of 1982. This period was defined as the "epidemic period." The investigators were able to eliminate a number of variables such as age, race, sex, medical history, severity of illness, procedures, surgery, surgeons, and therapeutic intervention as

---

1. The record is contained in twelve volumes including 788 pages of the State's documentary evidence. The defense called no witnesses. We are favored with a most comprehensive summary of the evidence in appellant's brief, which was adopted by the State and which made our review of the evidence much easier.

explanation for the increased death rate during the epidemic period. The statistics did show that only one nurse, the appellant, was assigned to the care of significantly more patients in the epidemic period at the time of their death. The investigators determined statistically that a child would have 10.7 times greater risk of dying while appellant was working than at the times when she was not working. Only one other nurse besides appellant was shown to have a significant association with patient deaths, but these were all related to shifts when both she and the appellant were working, and not to those shifts when appellant was not working.

It was also determined statistically that a CPR event was 25 times more likely to occur when appellant was working than when she was not working. Dr. Istre's report also stated that as to 8 of the 9 patients who had *recurrent* CPRs on different shifts in the epidemic period, appellant was assigned to their care during each CPR episode. The summary of Dr. Istre's report stated:

> Epidemiologic analysis associated (appellant) with increased number of deaths in cardiopulmonary arrests in the epidemic period and with the unexpected events that the consultant identified as occurring in that period. Finally, (appellant) was also associated with the unusual recurrence of cardiopulmonary arrests in the same patients on different evening shifts during the epidemic period.

Evidence was offered to show that appellant was aware of the proper use of the drug Heparin. Heparin is an anticoagulant which is normally used in small amounts to prevent a patient's blood from clotting and blocking blood vessels.

The complainant in this case was a 4 week old baby admitted to the hospital suffering from pneumonia. His condition had improved for two days when he suffered a cardiopulmonary arrest. Appellant was the nurse on duty at the time of the CPR. The testimony was that the CPR was rare for a child such as the complainant and was inconsistent with his improved progress. The cause of the CPR could not be determined. The complainant improved for two days and then suffered a massive diuresis, described as a life-threatening loss of body weight. Again the complainant improved until the evening shift on January 1, 1982, when the appellant was the nurse on duty. During the shift the complainant experienced another massive diuresis and according to appellant's nursing notes was in a critical situation. He could not breath on his own and required the use of ventilator. By the end of the shift which followed appellant's, the complainant had improved. He experienced another diuresis on January 2 which also remained unexplained.

On January 3 during the evening and night shifts the complainant experienced significant internal and external bleeding. The cause of the bleeding was not determined with certainty. The appellant was not on duty at the time. Appellant was the nurse on duty on the January 6 evening shift when the complainant experienced an episode of life-threatening bleeding, closely related in time to a full cardiac arrest. The attending physician ordered lab tests to be performed on blood samples. The tests revealed that the blood samples probably contained the drug Heparin. The treating physician, Dr. Copeland, became convinced that the complainant had received more than just a small overdose of Heparin accidentally. He ordered the removal of the arterial line from the complainant so there could be no accidental miscalculation of a dose.

On January 9, there was nothing in the complainant's condition to indicate that he was experiencing a bleeding problem. When a blood sample was drawn at 3:30, it was noted the blood clotted appropriately. Appellant wrote her first nursing note at 4:00 p.m. noting complainant bleeding from multiple sites. A hematologist testified that appellant's notation of bleeding at 4:00 p.m. was consistent with an injection of Heparin at or about the time of the notation.

The complainant's condition worsened, and Dr. Copeland was called in. Dr. Copeland testified that at the time he felt that

the complainant would have a cardiac arrest and die very shortly. He began to carry out a plan that he had previously formulated. First, he drew blood samples for laboratory analysis. Believing that the complainant had received Heparin, he administered a specific antidote for Heparin, and in about 20 minutes the bleeding stopped. Dr. Copeland concluded that the complainant had received a massive overdose of Heparin, and this was confirmed by laboratory analysis.

Suzanna Maldonado, a registered nurse in the PICU had made a list of all the children who had died between January 1981 and March of 1982. Maldonado stated that she noticed a connection between the list she had prepared and the care of those patients by the appellant. She also made a connection between the appellant and the increased number of CPRs. She discussed this with her supervisor. Thereafter she found a notation by her name on the nursing assignment sheet stating that she check her mailbox. In her mailbox she found a note which stated, "You're dead." There was testimony that the notation on the assignment sheet and the other note were in the handwriting of the appellant. During the testimony of Maldonado, the court ruled that the question of extraneous matters was not relevant and overruled the objections to Maldonado's testimony and Dr. Istre's testimony and report.

The State's final witness testified that she was in a holdover cell at the Bexar County Jail with the appellant. When asked what she was in there for, the appellant said that she was Genene Jones, "the nurse that killed the babies."

■ Appellant offers the same arguments with respect to points of error one, two and three relating to the testimony and report of Dr. Istre and the testimony of nurse Maldonado. That an accused should not be tried for some collateral crime or for being a criminal generally is a principle that requires no citation of authority.

However, the appellant concedes that extraneous transactions may become admissible if it is shown that the transaction is relevant to a material issue and the relevancy value outweighs its inflammatory or prejudicial potential. *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Crim.App.1983) (en banc).

Evidence of extraneous offenses have been admitted to show the context in which the criminal act occurred, to prove identity circumstantially, to prove intent, or show the defendant's motive. *Albrecht v. State*, 486 S.W.2d 97, 100 (Tex.Crim.App.1972). To this list we add that evidence of other crimes, wrongs or acts may be admissible to show absence of mistake or accident. TEX.R.CRIM.EVID. 404(b). Any of the above enumerated "exceptions" to the general rule would be an appropriate vehicle here for the offer by the State of the challenged evidence.

But the appellant strongly contends that evidence of the extraneous transactions should not be admitted unless an extraneous *offense* is clearly proved, and the accused is shown to have been its perpetrator. *Sanders v. State*, 604 S.W.2d 108, 111 (Tex.Crim.App.1980).[2]

The testimony of Istre and Maldonado did not prove that appellant was the perpetrator of any extraneous offenses. The evidence did nothing more than assign a statistical association between appellant and the increased mortality rate and CPR events.

■ But the trend is away from mechanistic application of general rules and exceptions in determining the admissibility of extraneous acts of misconduct by the accused. *Morgan v. State*, 692 S.W.2d 877, 879 (Tex.Crim.App.1985). Instead admissibility is determined by balancing the probative value of the evidence related to a material issue in the case against the potential for prejudicing the trier of fact. *Id.*

2. Since the State's proof was by circumstantial evidence, there was no need that a material issue be contested by the accused before the State could offer evidence of extraneous trans-

actions. *Jones v. State*, 568 S.W.2d 847, 858 (Tex.Crim.App.), *cert. denied*, 439 U.S. 959, 99 S.Ct. 363, 58 L.Ed.2d 352 (1978).

The facts in *Morgan* are particularly instructive. The case involved a charge of indecency with a child and was a *trial before the court*. The evidence established that appellant briefly touched the complainant child. The State offered evidence of two other brief touchings as proof of the requisite intent for the offense charged. The court observed that the materiality of intent goes without saying. Where intent cannot be inferred from the act itself, "other evidence relevant to that intent, even though such evidence constitutes an extraneous *transaction or offense* will be more probative than prejudicial." (Emphasis added.) *Id.* at 880. Since the appellant's conduct was as consistent with accident as with the lascivious intent, the court held that any extraneous acts tending to demonstrate the requisite intent would be admissible "so long as they are logically relevant to establishing appellant's specific intent." *Id.* at 881.

Though there was direct evidence linking the appellant to the extraneous events, the proffered evidence did not clearly prove extraneous offenses. "Even assuming that such other instances were short and, individually could be attributed to accident, the repetition of the conduct, in combination with the relatively short 'rubbing' of complainant's sister's genitals renders the inference of accidental conduct in the prosecuted offense highly improbable." The court concluded that the effort was not so much as a prosecution of the appellant for being a criminal in general but a seeking of an objective inference, *i.e.*, that the more often appellant touched the genitals of other children however briefly, the less likely it was that each touching occurred accidentally.

We apply the lessons learned in *Morgan* to the facts in the case at bar. The evidence pointed strikingly to the appellant as the person who had immediate access to the complainant at the time the injurious shot of Heparin must have been administered. Still it was the appellant's duty to administer medication to pediatric patients. The State therefore had to demonstrate that the appellant administered the shot and did so intentionally for the purpose of causing serious bodily injury to the complainant. This intent could not be inferred from the act itself. The greater the State's need to resort to extraneous evidence to prove some material issue in the case, the higher will be the probative value of the extraneous event in relation to its potential for prejudice. *Morgan*, 692 S.W.2d at 880, n. 3. Here the trial judge stated in the record his recognition of the emerging issues that demonstrated the State's need to resort to extraneous transactions.

The extraneous acts were demonstrated as being logically relevant to establishing the appellant's intent to cause serious bodily injury to the complainant. Though no extraneous offenses were clearly proved involving the appellant, the State was entitled to show the inordinate times the appellant was associated with life-threatening events in PICU as evidence that she was the one that administered the overdose of Heparin, and that she did not do so accidentally.

We therefore conclude that the testimony of Dr. Istre and the testimony of nurse Maldonado were logically relevant to establishing the identity of the appellant as the perpetrator of the crime and the fact that she did so intentionally.

The trier of fact in this case was the experienced trial judge himself. The law recognizes the ability of a trial court to disregard any and all inadmissible evidence brought forth during the trial. *Kimithi v. State*, 546 S.W.2d 323 (Tex.Crim.App.1977). It is axiomatic that a judge who has the ability to disregard inadmissible evidence would be equally insulated from the harm of prejudice emanating from evidence of extraneous acts. We hold that the relevancy value of the evidence of the extraneous transactions outweighs any inflammatory or prejudicial potential. The trial judge was correct in admitting the evidence of extraneous transactions, and the first three points of error are overruled.

Under the final point of error appellant challenges the sufficiency of the evidence to establish her identification as the perpetrator of the offense. She does not chal-

lenge the sufficiency of the evidence to show her intent or knowledge with respect to causing serious bodily injury.

The standard for reviewing a sufficiency of the evidence question in a criminal case is to view the evidence in the light most favorable to the verdict to determine if any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). This same standard applies in both direct and circumstantial evidence cases. *Carlsen v. State*, 654 S.W.2d 444, 449 (Tex.Crim.App.1983). In applying the standard, if it is determined that the evidence supports a reasonable hypothesis other than the guilt of the defendant, then a finding of guilt beyond a reasonable doubt is not a rational finding. *Id.*

■ The evidence established that nurse McKinney and the appellant were with the complainant at 3:30 p.m. on the date in question. At that time the complainant was getting well and specifically had no bleeding problems. Nurse McKinney went off duty and turned the patient over to the appellant. The next person other than the appellant to see the complainant was Dr. Freese, who was called to the bedside at approximately 4:00 p.m. and noticed that the complainant was bleeding from numerous sites. It was established by other testimony that the overdose of Heparin would have been administered within minutes of 4:00 p.m.

The appellant argues that the State did not account for the 30 minute period between 3:30 p.m. and 4:00 p.m., nor was it established that appellant was the only person who would have had access to the complainant's room during that period. Though others could possibly have had access to the patient, there was no evidence of anyone actually being with the complainant in the minutes preceeding 4:00 p.m. other than the appellant.

Applying the *Jackson* standard, we hold that a rational trier of fact could have found beyond a reasonable doubt that the appellant committed the crime charged. That someone other than the appellant

might have committed a crime is not a reasonable hypothesis under the evidence. Accordingly, the final point of error is overruled.

The judgment of conviction is affirmed.

CADENA, Chief Justice, concurring.

In his opinion Justice Dial correctly points out, with reference to appellant's complaint concerning the admission of evidence of extraneous offenses, that the State did not prove that the 81 deaths of infants during the period from January, 1979, to June 1982, were attributable to any conduct on the part of appellant, and that, therefore, evidence of such deaths was not evidence of extraneous offenses committed by appellant.

If, in fact, no connection was shown between conduct on the part of appellant and the prior infant deaths and CPR events, it is difficult to understand the reason for the admission of evidence concerning such prior events. Absent such connection, the evidence is irrelevant.

The majority opinion asserts that the evidence "did no more than assign a statistical association between appellant and the increased mortality rate and CPR events." A "statistical association" between appellant and the prior deaths would be relevant only if such "statistical association" means that appellant was somehow connected with the prior deaths. The only purpose served by the introduction of the evidence of prior events was to induce the court to believe that there was a connection between such events and appellant's conduct, and that such connection was evidence that she was guilty of injuring the infant complainant in this case.

The evidence does no more than suggest that appellant was present during many of the prior incidents. Unless we accept mere presence as evidence of guilt, the elaborate statistical structure built by Dr. Istre proves nothing concerning the guilt of appellant. There is no evidence concerning the causes of the prior incidents and, therefore, no connecting link between them and the injury to the child in this case. If the

testimony, as admitted in the majority opinion, does not prove that appellant was the perpetrator of any extraneous offenses, it cannot be persuasively argued that such evidence circumstantially proves intent, identity or motive, or shows absence of mistake or accident.

In *Morgan v. State,* 692 S.W.2d 877, 879 (Tex.Crim.App.1985), we are solemnly told that the trend is away "from mechanistic application of general rules and exceptions in determining admissibility of extraneous acts of misconduct by the accused." Admissibility is to be determined by balancing the probative value of the evidence in establishing a material issue in the case against the potential for prejudicing the trier of fact. It is not easy to understand why placing relevance and prejudicial effect on the scales and then automatically deciding on the basis of the manner in which the scales tilt is not the application of a "mechanistic" test.

As Justice Dial points out, the facts in *Morgan* are particularly instructive. Most instructive of all are the facts that the alleged offense consisted of indecency with a child and that the evidence of prior acts consisted of two other acts of indecency with the same child. The *Morgan* opinion, which warns against the rote application of general rules relied on what has all the appearance of a mechanistic and automatic application of the exception that where intent cannot be inferred from the act itself, evidence relevant to the issue of intent, including evidence of extraneous offenses, will be admissible because, under such circumstances, evidence of extraneous offenses "will be more probative than prejudicial."

The majority opinion overlooks the fact that *Morgan* actually involves the mechanistic application of an exception to the rule against admissibility of extraneous offenses. In *Battles v. State,* 140 S.W. 783 (Tex.Crim.App.1911), the Court held that the cases of rape of children prior acts of intercourse between defendant and his victim are admissible. *Boutwell v. State,* 719 S.W.2d 164, 178 (Tex.Crim.App.1985), makes it clear that the evidence held admissible in *Morgan* is received because it comes within "a narrow exception for sex offenses" which permits "admission of similar extraneous sex offenses between the *minor complainant and the accused.*" Even in such cases, the evidence is admissible only when defendant "denies the act or undermines the credibility of the [minor] complainant in some fashion," because in such cases "there is need for such evidence to shore up some part of the State's case," and "the extraneous acts between the [minor] complainant and the defendant are usually more probative than prejudicial." *Id.*

Since the "particularly instructive" facts which were present in *Morgan* are not present in this case, as far as this case is concerned, that case is not particularly instructive.

*Morgan* points out that where there is a strong need to prove intent because of an otherwise innocent act, extraneous acts are likely to be more probative than prejudicial. In this case, even if we overlook the fact that it does not involve a sexual offense against a child, there is no contention that the child was injured by an innocent act. The testimony of Dr. Copeland establishes that there was more than one instance of an overdose of Heparin and precludes the inference that there was an accidental overdose.

Since there is, and the majority opinion admits, no proof that the prior events were the result of acts committed by appellant, evidence of such prior events has no probative value whatever, and it cannot be seriously argued that its probative value outweighs its possible prejudicial effect.

However, since the trial was before the court, we must presume that the inadmissible testimony was not considered by the court. *Tolbert v. State,* 743 S.W.2d 631, 633 (Tex.Crim.App.1988).