**Genene JONES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 3–84–200–CR.**

Court of Appeals of Texas,
Austin.

Aug. 13, 1986.

Laura M. Little, Austin, for appellant.

Ronald L. Sutton, Dist. Atty., Junction, for appellee.

Before SHANNON, C.J., and EARL W. SMITH and GAMMAGE, JJ.

EARL W. SMITH, Justice.

Appellant was convicted, in a jury trial, of the offense of murder and sentenced to 99 years. She brings nine grounds of error: the trial court erred in denying the requested instruction on the lesser included offense of involuntary manslaughter; it erred in overruling appellant's motion to suppress results of tests performed on the

body of the deceased; the evidence is insufficient to support a conviction because the State failed to prove that appellant committed an act clearly dangerous to human life; the evidence is insufficient to support a conviction because the State failed to prove the "corpus delecti" of the offense; and the court erred in admitting evidence of five extraneous transactions. ' We will overrule all of appellant's grounds of error and affirm the judgment of conviction.

The State sought to prove that appellant, a licensed vocational nurse (L.V.N.) employed as an office nurse by Dr. Kathleen Holland, a pediatrician who opened an office in Kerrville, Texas on August 23, 1982, murdered Chelsea McClellan by injecting her with succinylcholine chloride, a muscle relaxant similar in its effect to curare, inducing respiratory arrest and, eventually, death. The motive advanced by the State was that appellant sought to demonstrate the need for a pediatric intensive care unit at Sid Peterson Hospital in Kerrville by, over a one-month period, causing respiratory arrests in a total of six children by injecting them with succinylcholine.

The drug succinylcholine chloride (trade name Anectine, hereafter succinylcholine or Anectine) is a drug which is usually used in connection with surgery. It is a muscle relaxant and is used so that intubation tubes may be placed down the throat without causing damage to the trachea. Appellant had knowledge of the use and effects of the drug. The drug was kept in Dr. Holland's office. Appellant had purchased an additional vial of the drug without Dr. Holland's knowledge.

Chelsea McClellan's mother, Petti McClellan, took Chelsea to Dr. Holland's office on August 24, 1982 because she thought Chelsea had a cold. While the mother gave Chelsea's medical history to Dr. Holland, appellant took Chelsea to another room. Shortly thereafter, appellant called for Dr. Holland. Mrs. McClellan was told that Chelsea had suffered a seizure. Chelsea remained in Sid Peterson Hospital for eight days of follow-up treatment after the emergency. A later EEG gave normal results, with no indication of seizure activity.

Mrs. McClellan returned to the clinic on September 17, 1982, not for Chelsea but for her son Camron, who had the flu. When she arrived, Dr. Holland decided that Chelsea should receive routine "baby shots." Mrs. McClellan accompanied appellant and Chelsea to the other room, in which there were already two prepared syringes on the counter. Appellant gave Chelsea an injection in the left upper thigh. Mrs. McClellan testified that Chelsea was not breathing right and that her eyes looked abnormal. Appellant told her that Chelsea was just acting up and being mad because of the shot. Appellant gave Chelsea another shot in the upper right thigh, and then Chelsea "went limp" with her eyes open. Appellant said that Chelsea had had a "seizure" and called for Dr. Holland. Chelsea was transferred to Sid Peterson Hospital.

A physician in the emergency room, Dr. Richard Mason, testified that Chelsea did not show signs of seizure, but the signs that he observed were consistent with a person "coming out from under" succinylcholine.

Dr. Holland decided to transfer Chelsea to San Antonio. Appellant was to accompany Chelsea in the ambulance. Chelsea appeared to be stable before being placed in the ambulance. Deanna Armour, a family friend and baby-sitter for Chelsea, testified that she saw appellant give Chelsea another injection in the upper leg just before Chelsea was loaded in the ambulance. Appellant told her it was Valium. Sharon Keith, an R.N., testified that she had already administered Valium on Dr. Holland's orders.

When the ambulance left for San Antonio, appellant accompanied Chelsea in the ambulance. Dr. Holland followed in her car because riding in the closed portion of a vehicle such as the ambulance made her quite ill. About twelve miles outside of Kerrville, Chelsea again quit breathing. The ambulance stopped so that Dr. Holland could attempt to resuscitate Chelsea. They

then drove to the Comfort Community Hospital where Chelsea was pronounced dead.

The first autopsy done on Chelsea by Dr. James Fletes of Severance & Associates, a group of pathologists in San Antonio, was inconclusive. No toxicological screen was done. He was unable to find a cause of death. Neither could his supervisor, Dr. Robert Galbreath, who requested a brain stem review by Dr. Kagen-Hallett, a neuropathologist (one who specializes in autopsying the brain).

Dr. Kagen-Hallet performed a review on the brain stem. She found what she reported as a "subtle gliosis" (scarring) in the brain stem area. Based on this and the medical records showing hyaline membrane disease, she initially arrived at a diagnosis of sudden infant death syndrome (SIDS). She later said that, even without the presence of succinylcholine, the more complete medical history that she later received would have ruled out SIDS.

Several other children had suffered seizures in Dr. Holland's office, while under appellant's care. These all occurred within the same one-month period. The hospital administration became concerned and at some point, the fact that a bottle of Anectine was unaccounted for became cause for concern. The missing bottle was later found, but it had unexplained holes in the stopper. Dr. Holland turned the bottle over to the hospital administrator.

In May of 1983, Dr. Galbreath provided Dr. Fredric Rieders with tissue samples that he had maintained. Chelsea's body was exhumed and additional samples taken. Dr. Rieders took these samples to the Karolinska Institute in Stockholm, Sweden, where he analyzed the tissue using a test developed by Dr. Bo Roland Holmstedt. The test used ion-pair extraction techniques (a way of separating small quantities of a substance from a large tissue sample) combined with gas chromatography mass spectrometry (GCMS), a method for separating and identifying substances. Dr. Rieders testified that his tests showed succinylcholine in Chelsea's tissue, with the highest concentration being in the thigh tissue.

The original pathological findings were revised to reflect death due to the injection of succinylcholine.

Evidence was also introduced to show that five other children suffered similar incidents while under appellant's care and that these incidents were similar to the one involving Chelsea and to each other and were indicative of a common plan or scheme.

We will first discuss appellant's challenge to the admissibility of the test results showing succinylcholine (ground of error two). We will then discuss the other grounds of error in order.

The traditional standard governing the admissibility of scientific evidence produced by novel techniques was enunciated in *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923), in which the court considered the admissibility of lie detector evidence as a case of first impression. The *Frye* court, without explanation, analysis, or citation of authority, set out what was to become the prevailing test for the next half-century:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Id.* at 1014. *Frye* thus imposed a special burden—the "general acceptance" test—on scientific evidence.

*Frye* has generated a great deal of controversy and criticism in recent years. *See, e.g.,* Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a HalfCentury Later,* 80 Colum.L. Rev. 1197 (1980); Imwinkelried, *A New Era in the Evolution of Scientific Evidence,* 23 Wm. & Mary L.Rev. 261 (1981); Imwinkelried, *The Standard for Admit-*

*ting Scientific Evidence: A Critique from the Perspective of Juror Psychology,* 28 Villanova L.Rev. 554 (1982–83); McCormick, *Scientific Evidence: Defining a New Approach to Admissibility,* 67 Iowa L.Rev. 879 (1982); Moenssens, *Admissibility of Scientific Evidence—An Alternative to the Frye Rule,* 25 Wm. & Mary L.Rev. 545 (1984).

Several arguments are usually advanced to support the use of the general acceptance test: that it establishes a method for insuring the reliability of scientific evidence; that it establishes a degree of uniformity of decision; that it eliminates hearings on the validity of scientific techniques; and that it insures that at least a "minimal reserve" of experts will be available to evaluate the technique's use in any given case. Giannelli, *supra,* at 1207; McCormick, *supra,* at 883.

The arguments against *Frye* are that it is extremely difficult to apply and that it does not really accomplish its goals because it is too vague. For example, the *Frye* test has been applied to a wide range of disparate evidence—united only by being classed as "scientific"—such as polygraphs, voiceprints, neutron activation analysis, gunshot residue tests, bitemark impressions, and "truth serum" tests. It has been applied when the scientific evidence was being used for different purposes. Yet the test is often applied with little analysis. Giannelli, *supra,* at 1206 n. 55.

Difficulties in applying *Frye* abound. First, a court must define parameters of the test: who must accept the procedure—identifying the applicable scientific community; what must be accepted—method, technique, principle; how general acceptance should be proved; and when *Frye* should be used.

Numerous alternatives to *Frye* have been advanced, with the most prevalent being to judge scientific evidence under the same rules of relevance as other types of evidence. McCormick, *supra,* at 879 n. 1. Some commentators have urged, and some courts have adopted, the view that the Fed-

eral Rules of Evidence, and state analogues have impliedly done away with *Frye.* The argument advanced to support using the general relevance analysis is that the general rules of evidence allow a judge to accomplish the objectives of *Frye,* while simultaneously allowing more flexibility to tailor admissibility decisions to the situation at hand.

## TEXAS LAW

Texas cases considering *Frye* have been few and are not particularly helpful. In *Romero v. State,* 493 S.W.2d 206 (Tex.Cr. App.1973), *Frye* was quoted but not analyzed. *Romero* dealt with polygraph evidence, a type of evidence that generally has been rejected as unreliable. Similarly, in *Cain v. State,* 549 S.W.2d 707 (Tex.Cr. App.1977), *cert. denied,* 434 U.S. 845, 98 S.Ct. 149, 54 L.Ed.2d 111 (1977), the court rejected the results of sodium amytal, or "truth serum," tests because they were not generally accepted. Again, the court did not analyze the general acceptance standard and was dealing with a type of evidence that generally has been perceived as unreliable.

Two courts of appeals have considered urine tests for drugs. The court in *Isaacks v. State,* 646 S.W.2d 602 (Tex.App.1983, pet. ref'd), considered and rejected the admissibility of urine test results performed on a particular system. The court, citing *Cain,* said that no evidence had been introduced to show that the test had obtained "scientific acceptance" as reliable and accurate. There were additional problems, however, with the competence of the machine's operator to testify as an expert because she knew nothing about the theory of the machine's operation. *Id.* The court in *Wilson v. State,* 697 S.W.2d 83 (Tex.App. 1985) (pet. requested) considered a particular urine test system. There was no problem with the expert's credentials. The court said that the State had not demonstrated "scientific acceptance." The expert, when asked whether the test had gained scientific acceptance said that he could not speak for the entire scientific

community but that the Centers for Disease Control in Atlanta was satisfied with test. *Id.* at 84. Neither court analyzed the process of gaining scientific acceptance.

Numerous sources develop the *Frye* analysis. We will first set out the various criteria, then apply them to our facts.

■ The appropriate field or scientific community must be identified. Giannelli, *supra,* p. 1208, *see, e.g., People v. Collins,* 94 Misc.2d 704, 708, 405 N.Y.S.2d 365, 368 (Sup.Ct.1978). This step is more difficult than may first appear. Many scientific techniques—particularly novel ones—are not contained within a single academic discipline or professional field. For example, one case names "the medical profession" as the relevant field for bitemark analysis, while another says "dentistry." *Compare People v. Milone,* 43 Ill.App.3d 385, 2 Ill. Dec. 63, 356 N.E.2d 1350 (1976) ("medical profession"), *with People v. Slone,* 76 Cal. App.3d 611, 143 Cal.Rptr. 61 (1978) ("dentistry"). One court defined the appropriate field not in terms of a discipline or profession but rather, for any given test, "those who would be expected to be familiar with its use." *People v. Williams,* 164 Cal. App.2d Supp. 858, 331 P.2d 251 (1958) (Nalline test for narcotic use; prosecution expert testified that the medical profession in general was unfamiliar with its use; selection of "medicine" as the field would have blocked admissibility because that which is generally unknown cannot be generally accepted).

Once the appropriate field has been selected, the next step is to determine whether general acceptance in that field has been reached. "General acceptance" has never been very well defined. One court, in rejecting the "general acceptance" standard, noted the difficulty of "counting scientific noses" and the rarity of majority consensus among scientists. *United States v. Williams,* 583 F.2d 1194, 1198 (2d Cir.1978), *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979). Other courts have offered general definitions such as: "widespread, prevalent; extensive though not universal." *United States v. Zeiger,* 350

F.Supp. 685, 688 (D.D.C.), rev'd, 475 F.2d 1280 (D.C.Cir.1972); or, the concession that "a degree of scientific divergence of view is inevitable." *Commonwealth v. Lykus,* 367 Mass. 191, 327 N.E.2d 671, 678 n. 6 (1975). The only consensus that one can find seems to be a requirement of acceptance by more than the single expert who developed the test but less than unanimity. Giannelli, *supra,* at 1211 n. 91.

Another parameter that must be defined is precisely what must be generally accepted? The basic, underlying principle? The technique applying it? The technique applied to a particular set of facts? Voiceprint evidence is a good example. In many cases which allowed the use of voiceprint evidence, the focus was on whether two spectrographic charts could indeed be matched—which was fairly easy to show. The principle underlying voiceprints, however—that no two voices are exactly alike—had not been empirically verified nor generally accepted. Any case focusing on the underlying principle would have excluded the evidence.

Another parameter to be defined is the type of proof of general acceptance to allow: (1) expert testimony; (2) scientific and legal writings; (3) judicial opinions.

The usual practice has been to call an expert who testifies both to the validity of the technique and to its general acceptance. Some courts have decided that the testimony of one expert that a technique has been generally accepted can never be sufficient. *See, e.g., Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277, 1282 (Pa.1977); Giannelli, *supra,* at 1215. Other courts have balked at finding general acceptance where the testimony of general acceptance came only from experts whose reputations and careers had been built on the test about which they were testifying. Giannelli, *supra,* at 1216.

Some courts have used scientific and legal periodicals to establish general acceptance. The courts have not used periodicals to establish the validity of the technique but to establish its general acceptance in the scientific community. A problem with

this method is that much, or most, of the relevant information will be in highly technical scientific journals, which the court may not be well-equipped to research.

Some courts consider prior judicial opinions allowing admission of evidence in determining general acceptance.

### FRYE APPLIED TO TESTING FOR SUCCINYLCHOLINE BY GCMS

We first must distinguish the case at hand from the case of *Coppolino v. State*, 223 So.2d 68 (Fla.App.1968), *cert. denied*, 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 794 (1970). *Coppolino* is widely cited for the general proposition that review of the admissibility of scientific evidence should be on an "abuse of discretion" standard; *i.e.*, scientific evidence should be treated as any other evidence (although the court acknowledged that it was bound by *Frye*, which the Florida Supreme Court had adopted). This general principle must be separated from the actual test used in *Coppolino*. The test in *Coppolino* used bioassay techniques, which are different than the one at issue here. Another difference is that the test in *Coppolino* detected succinic acid and choline rather than succinylcholine as a unit. The test found significantly higher than average concentrations of these two naturally-occuring chemicals at injection sites on the body. The test in *Coppolino* does not provide a basis for our admission of the gas chromatography-mass spectroscopy test used in this case.

We believe the analysis that we will go through in attempting to determine whether the general acceptance standard has been met will illustrate the flaws in that standard, which we believe Texas case law should explicitly abolish in favor of the general relevance analysis under the rules of evidence.

### TESTIMONY CONCERNING TESTING BY GCMS—MOTION TO SUPPRESS

Dr. Bo Roland Holmstedt developed the test at issue. We note a procedural pecu-liarity: Dr. Holmstedt is a proponent of the test, yet he was called, on direct examination, by the defense. Dr. Holmstedt is a M.D. under the Swedish system, which is comparable to a M.D./Ph.D. in the United States. He is a retired toxicology professor at the Karolinska Institute and a member of, *inter alia*, the Swedish Royal Academy of Sciences. No further detail need be given, as there is no dispute about Dr. Holmstedt's qualifications.[1]

Dr. Holmstedt's testimony as to the *process* of general acceptance in the scientific community is as follows. In general, a scientific test or method is published in a reputable, international journal; then other scientists will use it and validate it. In response to a question whether use by other research workers of a particular test is a *requirement* of general acceptance, he answered, "Not necessarily." A particular test can be accepted because of "inherent principles." Completely independent duplication of a test is the most preferable or desirable way.

Dr. Holmstedt testified that he began working on a test to detect succinylcholine "about three years" ago. The test that he developed, on embalmed rat tissue, has been published in two major toxicology journals and presented at four conferences. He did not know of anyone, other than Dr. Forney (a collaborator in developing the test), who had independently duplicated the published test. In response to a question whether that alone prevented general acceptance of the technique, his response was that because there was little difference in detecting acetylcholine and that acetylcholine testing was generally accepted, the principles of the test were accepted.

He also testified that the method had originally been developed on embalmed human tissue. The human tissue testing had never been published because the case in which it was used was still pending and the defendant was a fugitive from justice.

---

1. We will not discuss any expert's qualifications in much detail because there is no challenge to their expertise.

On cross-examination (by the State), Dr. Holmstedt amplified the publication/presentation process. Before an article is published it goes to referees, usually three, who read the paper and comment, although they themselves do not duplicate the test. The editor then decides whether to publish the work. Similarly, before a conference presentation, an abstract of the work is reviewed by a committee, which then decides whether to allow the presentation. Presentation is another way to achieve general acceptance and does not involve as great a time lag as the publication process does.

Dr. Holmstedt testified that the GCMS technique became available in 1964, but had not been applied to attempt to detect succinylcholine until three or four years before the time of this trial, when, prompted by Dr. Forney's criminal case, Dr. Holmstedt did so. Dr. Holmstedt and others had been engaged in succinylcholine research since the 1950's, using paper chromatography and bioassay techniques. The principal reasons for using the GCMS technique are its sensitivity in detecting minute amounts of a given substance and its selectivity in distinguishing various compounds. Prior to using GCMS, they could detect the general class of compounds to which succinylcholine belongs in the submicrogram range while GCMS allows detection in the nanogram and sometimes pikogram range, considerably smaller quantities.

Dr. Holmstedt testified that acetylcholine and succinylcholine are related; they are both choline esters. Succinylcholine has a higher molecular weight than acetylcholine. Acetylcholine and other choline esters had been detected for many years. Acetylcholine had been detected since 1969, with publication in *Nature* or *Science* (he was unsure which) in 1970 or 1971. Acetylcholine detection by GCMS had been generally accepted since then. The same basic technique was used to detect succinylcholine—Dr. Holmstedt testified that the only difference in the techniques or methods was the end product; *i.e.*, one technique detected succinylcholine, the other acetylcholine.

The method was the same in both cases, he said.

He said that he has used this test for humans, rats, and dogs, and would use the same method on all mammal tissue. He said that the method was past the experimental stage and that he had not received criticism of his technique from anyone in the field of toxicology.

The State also introduced an article by Drs. Balkon and Donnelly. Dr. Holmstedt had not worked with Dr. Balkon. He had forgotten about him when asked about independent confirmation. The Balkon article referred to the published work as a "significant advance." Dr. Balkon was not attempting to duplicate Dr. Holmstedt's work, but rather to modify it to allow use of the principal techniques with cheaper instruments that were more readily available at most forensic laboratories, which indicates an implied acceptance of the underlying technique.

Dr. Fredric Rieders (State's witness; proponent of test) is a forensic toxicologist with a Ph.D. He testified as follows:

Both acetylcholine and succinylcholine are choline esters and are in the same class of compounds—quaternary ammonium compounds. The ion-pair extraction method for separating small amounts of a desired substance from a large tissue sample is well-established for quaternary ammonium compounds; all of the underlying methods are well-established. He performed the testing on Chelsea's tissue (in Sweden at the Karolinska Institute) according to the published procedures and found them accurate. He had no question as to the validity of the technique and no questions were raised at meetings he attended where the technique was presented.

He was "reasonably sure" that Dr. Balkon had independently duplicated the test (Dr. Balkon told him that he had) and Dr. Forney had duplicated it. In his opinion, Forney was independent of the Karolinska Institute. He also explained that anytime he ran an analysis he set up an internal control and that this was a common routine.

On cross-examination, he said that there had been no full peer-reviewed article on the method as applied to human tissue, but conference abstracts were reviewed, although to a lesser degree. He had never independently verified the technique in rat tissue because he was not interested in rat tissue. He was not sure that tissue species would make a difference but storage techniques might. He also said that he was reasonably certain that the same technique would work without modification on any mammal muscle tissue.

Dr. William E. Kurtin (State's witness; proponent of test) is the head of the chemistry department at Trinity University in San Antonio and has a Ph.D. in biochemistry. He is familiar with the technique used for detecting acetylcholine and considers the technique valid as applied to detect succinylcholine. In his opinion, Dr. Holmstedt's conclusions were based on valid, accepted scientific methodology; and the technique has passed beyond the experimental state and is an accepted one. He testified that, as a general matter, one can take an established analytical technique and apply it to a whole variety of different situations without re-establishing the method; that he could not testify as to any special concerns in the toxicology area but that in science in general, there was no fixed number of times that a test had to be repeated to gain wide acceptance. He testified that in analytical chemistry, it is common that a basic analytic technique is developed and becomes accepted, then is applied to all compounds in that particular class; as applied to those later compounds, the method has already been duplicated and accepted. He also said that it is "sometimes difficult" to get another article published that simply repeated a particular analysis on another compound in the same class.

On cross-examination, he said that it was possible that species differences and preservation techniques could affect the test but he also said that rats are an accepted animal for testing drugs, for example, and noted that it is not always possible to have an exact human control situation.

Dr. Peter Proctor (defense witness; opponent of test) is a medical toxicologist with an M.D. and a Ph.D. in biophysics and pharmacology. His testimony on general acceptance was as follows:

In his opinion, reproduction of a technique was an absolute requirement for general acceptance and totally independent reproduction of a technique was absolutely essential to its scientific acceptance. He also said that the published work on rat tissue would not be generally accepted as applied to humans even if it were duplicated, in the absence of human control studies.

He also testified that a Dr. Hanin had criticized the particular GCMS technique used by Dr. Holmstedt; that because it depended on small fragments of molecules it was difficult to detect "interference" from other compounds in the tertiary amine class, which naturally occur in the body.

On cross-examination, Dr. Proctor testified that he had not done a great deal of work with a mass spectrometer; and that he had never used one to detect acetylcholine or succinylcholine. It was also developed that the criticism of the technique by Dr. Hanin had come before Dr. Holmstedt had authored a chapter in Dr. Hanin's handbook on that technique. He was unfamiliar with the Balkon article and with Dr. Holmstedt's two journal articles until he was approached to testify in the case. He was also unfamiliar with Dr. Rieders.

His opinion was that gas chromatography was "more of an art than a science." He has not attempted to use his proposed method (in testimony) of establishing human control studies by taking embalmed tissue and adding succinylcholine.

## GENERAL ACCEPTANCE OF THE TEST USED

After reviewing the testimony set out above, we must first consider the possibility that *Frye* does not apply at all. Succinylcholine and acetylcholine are members

of the same class. Succinylcholine was described as two acetylcholine molecules "hooked" together. There is a great deal of testimony that the GCMS technique has been applied to detect acetylcholine since 1970/1971 and has been generally accepted and at least one witness testified that when an analytic technique is applied to one class of compounds one does not necessarily publish its application to other members of that class. Therefore, it is possible that *Frye* is not applicable because this is not the kind of novel technique that *Frye* purported to deal with.

In analyzing general acceptance, we must first decide who must generally accept the test, what "field" it belongs in. Here we have an analytical chemistry technique applied in a forensic setting. We have testimony from forensic toxicologists, medical toxicologists, and a chemistry professor. Subjects of degrees include pharmacology, chemistry, biochemistry, and biophysics. Is the field then forensic toxicology? Yet the technique is used in many areas. Of course, it is also possible to use the formulation that the test must be accepted by those scientists familiar with the use of the GCMS technique.

The next problem is what must be accepted. In the voiceprint cases there were three components: (1) the underlying theory that no two voices are alike; (2) whether certain devices could be used to make "prints" of those voices, comparable to fingerprints; (3) whether these prints could be matched. No matter how well-established two and three are, everything crumbles if any two voices are alike. Here, it is not as easy to find the components of what we are analyzing. The GCMS process has a tremendous number of basic principles underlying it—all of the principles that support gas chromatography and mass spectrometry as being techniques capable of identifying substances. If we accept GCMS as generally accepted, then must we find that the precise application at issue in all its particulars has been generally accepted or can we extrapolate from the very similar applications that were discussed?

It was not possible to establish from the expert testimony what constituted "general acceptance" in the scientific community. The defense attempted to establish publication/independent replication as the criteria, and, in a crude way, that is correct. The evidence showed that the precise test used in Chelsea's case had not yet been published. The defense also raised the question of independent replication in that one doctor who also performed this test had worked with Dr. Holmstedt in developing it and Dr. Rieders, who actually performed the test, did it at the Karolinska Institute in collaboration with one of Dr. Holmstedt's colleagues. Testimony also showed, however, that a Dr. Balkon had independently performed the test. The State also presented evidence that disputed the rigidity of the defense system for achieving general acceptance.

We must also look at the reasons behind the use of *Frye*. One reason is to keep jurors from being overly swayed by what they are commonly perceived to view as infallible testimony; to protect them from the "overwhelming impact" of scientific evidence. Another is to prevent the fact-finding function of the jury from being usurped by a scientific test. Many different types of tests have been lumped together under the rubric "scientific evidence" and the tests have been used for different purposes. A lie detector test, for example, purports to say, "He lied when he said he did not do it and therefore he must be guilty." Some of the voice identification or gun-handling residue tests also tend to have the effect of identifying a particular person as the guilty party, without the need for any other evidence. The test at issue here does not have that kind of overwhelming impact on the jury. The test here identifies the presence of a particular chemical in tissue—nothing more. The mere identification of succinylcholine in Chelsea's tissue is not enough to convict appellant. A large amount of other evidence was also presented: medical evidence that Chelsea, and other children, suffered unexplained seizures; that these incidents happened in a very short period of time;

that appellant had the opportunity to inject succinylcholine and others did not; the entire case of circumstantial evidence presented at trial. This test did not produce the kind of evidence that has an overwhelming impact.

 We have testimony from several experts that supports the proposition that the test at issue was generally accepted. The testimony satisfies the main concerns raised by *Frye*. We find that, inasmuch as it is really possible to determine "general acceptance," the trial judge properly admitted the test under *Frye*.

## DISSATISFACTION WITH FRYE

As have many other courts, we find ourselves dissatisfied with *Frye*. Courts and commentators have taken varying positions on the standard that should be applied to assess the admissibility of scientific evidence. The general trend has been toward consideration of scientific evidence under the usual relevance and expert testimony rules. McCormick, *supra*, at 879 n. 1.

*Coppolino v. State*, 223 So.2d 68 (Fla. App.1968), *cert. denied*, 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 794 (1970) involved the detection of succinic acid and choline by bioassay techniques. The court said that Florida had apparently adopted the *Frye* rule. *Id.* at 70. It then went on to say that a trial judge enjoys wide discretion in admitting evidence and will be overruled only on a showing of abuse of discretion, and allowed the admission of the evidence. *Id.* at 70–71. *Coppolino* is widely cited for the proposition that scientific evidence should be treated like any other evidence.

Numerous cases other than *Coppolino* have altered the *Frye* test or purported to apply it while simply saying that the trial court did not abuse its discretion in admitting the evidence, with no attempt to analyze general acceptance.

In *United States v. Stifel*, 433 F.2d 431 (6th Cir.1970), *cert. denied*, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971), the Sixth Circuit cited *Frye* in allowing the admissibility of neutron activation analysis.

Three defense experts attacked the procedure; two of them said that the technique was too new and untried and that the test results were "inconclusive" for court use. *Id.* at 438. The court, reviewing on an "abuse of discretion" standard, said that the trial court had not breached the *Frye* standard in admitting the evidence. The dispute concerning novelty affected the *quality* rather than the *admissibility* of the test results. The court then said, "[N]either newness nor lack of absolute certainty in a test suffices to render it inadmissible in court. Every useful new development must have its first day in court." *Id.* at 438. The court followed the same reasoning in upholding a trial court ruling admitting results of spectrographic analysis. *United States v. Franks*, 511 F.2d 25, 33 (6th Cir.), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975).

Other circuits have also re-considered *Frye*. In *United States v. Baller*, 519 F.2d 463 (4th Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975), the court upheld the admission of spectrographic analysis. The court did not cite *Frye* as the correct standard but said (citing *Coppolino* and *Stifel*):

Unless an exaggerated popular opinion of the accuracy of a particular technique makes its use prejudicial or likely to mislead the jury, it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation.

*Id.* at 466.

The Seventh and Ninth Circuits have not expressly rejected the *Frye* standard, but have treated the admissibility of polygraph evidence as a matter within the trial court's discretion, under the analysis used by the Federal Rules of Evidence. *United States v. Rumell*, 642 F.2d 213, 215 (7th Cir.1981); *United States v. Marshall*, 526 F.2d 1349, 1360 (9th Cir.1975), *cert. denied*, 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376 (1976).

The First Circuit cited *Frye* but applied traditional analysis under the Federal Rules to uphold the trial court's exclusion

of expert testimony on the unreliability of eyewitness identification. *United States v. Fosher*, 590 F.2d 381, 383–84 (1st Cir.1979).

Many state courts have either modified or impliedly rejected *Frye*. One group of cases has taken the approach of equating "general acceptance" with a requirement of showing the reliability of the scientific principle or technique. *See, e.g., State v. Clawson*, 165 W.Va. 588, 270 S.E.2d 659 (1980) (microanalysis of hairs); McCormick, *supra*, at 892 n. 83. Another approach has been to see *Frye* as affecting the *weight*, rather than the *admissibility* of the evidence. *People v. Marx*, 54 Cal.App.3d 100, 126 Cal.Rptr. 350 (1975) (bitemark comparisons); *Jenkins v. State*, 156 Ga.App. 387, 274 S.E.2d 618 (1980) (electrophoresis—method of identifying blood samples).

Another approach to *Frye* has been to say that *Frye* applied only to "scientific methodology," not to particular study results based on that methodology. *Ibn-Tamas v. United States*, 407 A.2d 626 (D.C. Cir.1979) (psychiatrist's methodology for studying battered women had gained general acceptance; not necessary that particular study results have similar acceptance).

Still other state and federal courts have expressly rejected *Frye*. The Second Circuit, in *United States v. Williams*, 583 F.2d 1194 (2d Cir.1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979), did so in a case involving voice spectrographic analysis, limiting *Frye* to the "ascertainment of scientific principles" rather than to techniques or particular applications of those principles. The court applied the traditional relevancy analysis, discussing the probative value and reliability of the evidence as weighed against the tendency to confuse, mislead or prejudice the jury. The court rejected the necessity of a threshold showing of general scientific acceptance. *Id.* at 1198–99.

The Wisconsin Supreme Court rejected *Frye* in *Watson v. State*, 64 Wis.2d 264, 219 N.W.2d 398 (1974), in a case involving hair identification. The existence of contrary scientific opinion created a credibility issue for the jury to decide. *Id.* 219 N.W.2d at 403.

Other courts have expressly rejected *Frye* in favor of rules of evidence patterned on the Federal Rules. *Whalen v. State*, 434 A.2d 1346 (Del.1980), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982) (test for semen; no testimony regarding general acceptance; analyzed under traditional relevancy principles); *State v. Williams*, 388 A.2d 500 (Me. 1978) (spectrographic analysis; no reason for special rule; general rules provide sufficient framework to make reliability judgment; *Frye* values are factors to be considered); *State v. Hall*, 297 N.W.2d 80 (Iowa 1980), *cert. denied*, 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981) (blood spatter analysis; applied general rules; *Frye* rationale relevant insofar as has bearing on reliability); *Oregon v. Brown*, 297 Or. 404, 687 P.2d 751 (1984) (polygraph evidence excluded; scientific evidence to be analyzed under ordinary rules of evidence).

Although *Frye* has been greatly modified or rejected in many jurisdictions, courts still tend to be cautious about scientific evidence—its accuracy and reliability must be demonstrated. Those who favor the proposition that scientific evidence should be judged under traditional relevancy analysis believe that the goals of *Frye* can be accomplished within this framework. McCormick, *supra*, at 908–909.

In *Oregon v. Brown, supra*, the court rejected *Frye* in favor of analysis under the Oregon rules patterned after Federal Rules of Evidence 401, 403, and 702. Expert evidence is admissible if it is relevant, and its probative value outweighs its prejudicial value. *Id.* 687 P.2d at 754. The court said that the relevancy analysis should include, as guidelines, the factors that have been set forth in sources such as Weinstein's Evidence:

(1) The technique's general acceptance in the field;

(2) The expert's qualifications and stature;

(3) The use which has been made of the technique;

(4) The potential rate of error;

(5) The existence of specialized literature;

(6) The novelty of the invention; and

(7) The extent to which the technique relies on the subjective interpretation of the expert.

*Id.* at 759. The existence or nonexistence of these factors may all enter into the court's final decision on admissibility but need not necessarily do so. *Id.* What was important was to sharpen the admissibility analysis.

McCormick, *supra,* at 911–12 identifies eleven factors that have been considered in analyzing the probative value of scientific evidence:

(1) The potential error rate in using the technique;

(2) The existence and maintenance of standards governing its use;

(3) Presence of safeguards in the characteristics of the technique;

(4) Analogy to other scientific techniques whose results are admissible;

(5) The extent to which the technique has been accepted by scientists in the field involved;

(6) The nature and breadth of the inference adduced;

(7) The clarity and simplicity with which the technique can be described and its results explained;

(8) The extent to which the basic data are verifiable by the court and jury;

(9) The availability of other experts to test and evaluate the technique;

(10) The probative significance of the evidence in the circumstances of the case; and

(11) The care with which the technique was employed in the case.

Texas has adopted rules of evidence for criminal cases, effective in September 1986, patterned after the Federal Rules. We think that Texas should follow the cases that have rejected *Frye* and adopt the general relevancy analysis of the rules, with consideration to using the factors set out by McCormick as a guideline for analysis.

■ Because we consider the test used in this case to have attained "general acceptance" pursuant to *Frye,* we find that the trial court did not err in admitting the test results, and overrule appellant's second ground of error.

Appellant, by her first ground of error, claims that the trial court erred in denying appellant's requested instruction on the lesser included offense of involuntary manslaughter.

■ To determine whether a charge on a lesser included offense must be given, a two-step analysis is followed: the lesser included offense must be included within the proof necessary to establish the offense charged and there must be some evidence that if the defendant is guilty, he or she is guilty of only the lesser offense. *Aguilar v. State,* 682 S.W.2d 556 (Tex.Cr.App.1985). Involuntary manslaughter is a lesser included offense of murder. *Brooks v. State,* 548 S.W.2d 680 (Tex.Cr.App.1977). Appellant still fails the second test in *Aguilar:* there is no evidence in this cause that, if guilty at all, the defendant is guilty of *only* the lesser offense.

■ The two elements that appellant points to as distinguishing involuntary manslaughter under Tex.Pen.Code Ann. § 19.05 from murder are that involuntary manslaughter does not require proof that the act committed was clearly dangerous to human life nor that the accused intended to cause serious bodily injury. Appellant focuses on the second element and claims that the evidence was as probative that she acted recklessly as that she acted intentionally. Appellant advances the test used in *Dillon v. State,* 574 S.W.2d 92 (Tex.Cr.App. 1978) as being appropriate to test whether appellant acted knowingly or recklessly. The difference between an *intentional* act on appellant's part that caused serious bodily injury and a *reckless* act on appellant's part that did so is whether appellant *knew* her conduct was *reasonably certain* to cause serious bodily injury or whether she

was aware of, but consciously disregarded, a substantial and unjustifiable risk that her conduct would cause serious bodily harm.

It is clear from the record that the administration of succinylcholine in an improper fashion or by an improperly trained person would cause serious bodily injury or death. The evidence shows that appellant's use of the drug was both administration by an improper person and in an improper fashion. Several witnesses testified that an L.V.N. is not an appropriate person to administer succinylcholine. Dr. Angie Clark, a professor of nursing at U.T. Austin, said that an L.V.N. would not ordinarily give the drug without a doctor's standing order or without a doctor's supervision. She also said that it would not be appropriate to give a drug such as succinylcholine to a child who is *not already on* a ventilator. Five other medical witnesses testified that it is not appropriate for an L.V.N. to administer succinylcholine.

The record also shows that appellant knew of the risk. Dr. Sheila Schwartzman testified that appellant requested her to give a lecture on pediatric anesthesia. Succinylcholine was discussed. The outline covering that portion of the lecture was introduced into evidence and showed that cardiac arrythmia was a possible side effect. Debra Sultenfuss, an L.V.N. and friend of appellant, said that she and appellant had done some research on the drug.

Appellant points to the evidence concerning her resuscitative efforts on Chelsea as supporting the hypothesis that she did not intend to cause serious bodily injury; the fact that she used techniques designed to respirate the child and negate any bodily injury from the drug raises the possibility that she acted recklessly in administering the drug in an inappropriate fashion, appellant argues. There was testimony that succinylcholine is routinely used in anesthesiology and, under proper conditions, is not life-threatening. And, appellant did attempt, quite vigorously, to resuscitate the child. The flaw in appellant's premise, however, is that the respiratory support measures are to be taken *in advance of* administering the drug, as the testimony of Dr. Clark, a defense witness, showed. The other medical testimony concerned the administration of succinylcholine in an operating room under carefully controlled conditions. There is no evidence that appellant attempted to replicate the kind of support measures that the medical experts were testifying about. Resuscitation efforts begun after a respiratory or cardiac arrest has been induced by administration of the drug are not the type of precautions to which the medical testimony was referring, and do not support the inference that appellant was merely reckless because of her resuscitative efforts. *See Montelongo v. State*, 644 S.W.2d 710 (Tex.Cr.App.1983) (defendant claimed entitlement to a charge on involuntary manslaughter because he believed he was disciplining the victim and he treated the wounds; neither the motive for the beating nor the subsequent actions raised the issue of recklessness).

There was also evidence of knowing and intentional acts on appellant's part by way of statements that she made—that she was in Kerrville to start a pediatric intensive care unit when the hospital administrator said there had never been any plans to do so; and that enough sick kids (to justify the unit) were out there if you went and found them.

We find that the evidence did not raise the issue of recklessness, on which appellant bases her claim of entitlement to an instruction on the lesser included offense of involuntary manslaughter. We overrule appellant's first ground of error.

Appellant, by her third ground of error, asserts that the evidence is insufficient to support a judgment of conviction because the State failed to prove that appellant committed an act clearly dangerous to human life.

Appellant claims that the State has failed to prove a necessary element of the offense of murder under Tex.Pen.Code Ann. § 19.02(a)(2): that appellant committed an act clearly dangerous to human life. An objective standard is to be used; the act

intended to cause serious bodily injury must be proved to be objectively clearly dangerous to human life. *Lugo-Lugo v. State,* 650 S.W.2d 72, 75 (Tex.Cr.App.1983).

As with her first ground of error, appellant points to her efforts at resuscitating Chelsea. She says that the State failed to show that Chelsea was not properly intubated and respirated. Since there was medical evidence that if a person is properly intubated and respirated, the administration of succinylcholine is not clearly dangerous, the State failed to show that appellant committed an act that was clearly dangerous to human life. Appellant's brief, however, negates this contention when it says that *after* Chelsea stopped breathing, appellant attempted to intubate and respirate the child. The medical testimony as to the "safety" of succinylcholine dealt with its administration in the carefully controlled conditions of an operating room; with precautions taken *before the patient is given the drug, not efforts to revive the patient only after respiratory failure has occurred.*

The evidence connecting appellant to the administration of the drug is set out in ground of error number four. We find the evidence sufficient to show that appellant committed an act clearly dangerous to human life and overrule appellant's third ground of error.

■ Appellant, by her fourth ground of error, asserts that the evidence is insufficient to support a judgment of conviction in that the State failed to prove the "corpus delecti" of the offense. Two elements must be shown in proving corpus delecti: (1) the body of the deceased must be identified; and (2) the death of the deceased must be shown to have been caused by the criminal act of another. *Nathan v. State,* 611 S.W.2d 69 (Tex.Cr.App.1981). Appellant challenges the sufficiency of the State's evidence on the second element. Appellant contends that the State failed to prove that the death of the deceased resulted from any criminal act at all, much less one committed by appellant.

An appellate court must review the evidence in the light most favorable to the jury's verdict. *Jackson v. State,* 548 S.W.2d 685 (Tex.Cr.App.1977). The standard of review is whether a rational trier of fact could have found the necessary elements of the crime beyond a reasonable doubt. *Wilson v. State,* 654 S.W.2d 465, 471 (Tex.Cr.App.1983). If the evidence supports an inference other than guilt, the fact finder could not rationally find the accused guilty beyond a reasonable doubt. *Id.* at 472. Evidence that amounts only to a strong suspicion or mere probability is insufficient to sustain a conviction. *Young v. State,* 544 S.W.2d 421 (Tex.Cr.App.1976).

There was conflicting testimony as to the cause of Chelsea's death. A conflict in testimony does not render the evidence insufficient, however. The weight to be given to the evidence and the credibility of the witness are matters left to the jury's judgment.

There was testimony that succinylcholine was present in Chelsea's body. Dr. Rieders performed the tissue analysis on Chelsea's body at the laboratory in Sweden. He said that his analysis showed succinylcholine. He also testified that he performed additional studies on the tissue that showed the presence of a preservative characteristically used with Anectine. Dr. Holmstedt, the developer of the technique used, testified that he performed the same tests on Chelsea's tissue that Dr. Rieders performed, after Dr. Rieders had returned to the United States. In his opinion, these tests confirmed Dr. Rieders' results, and showed succinylcholine. Dr. James Garriott, the chief toxicologist for the Bexar County Medical Examiner's office, reviewed Rieder's and Holmstedt's spectrographic charts and said that they showed the presence of succinylcholine at low levels. Dr. Joseph Balkon disagreed. He did not think that succinylcholine could be definitely identified at such low levels without additional testing.

The defense tried to establish that succinylcholine could be naturally synthesized in the body from succinic acid and choline, its

constituent parts, which occur naturally in the body. Dr. Rieders said that he supposed that it was theoretically possible, but he thought that it was highly improbable, given the 80° centigrade (176° fahrenheit) temperature needed to synthesize the compound. (100° C. is 212° F.—the boiling point of water).

There was also conflicting testimony concerning whether Chelsea's symptoms were consistent with the administration of succinylcholine. Dr. Richard Mason, an emergency room physician, testified that Chelsea's movements were more characteristic of someone coming out from under succinylcholine than from a seizure. Dr. William Goldie, a pediatric neurologist, testified that the observations were consistent with seizures. Dr. Eric Comstock, a medical toxicologist, testified that seizure activity was inconsistent with the movements that would be made in coming out from under succinylcholine and that medical people were not likely to confuse the two. There was also evidence, however, that the term "seizure" had been used based on *appellant's description* of Chelsea's movements; that Dr. Holland relied on this description as an "accurate clinical description"; and that appellant's written medical report of one of Chelsea's seizures differed from what appellant first told Dr. Holland and from Dr. Holland's observations.

Numerous opinions as to the cause of Chelsea's death were given. Several of the witnesses stressed the importance of the medical history that they had first been given—the pathologists Dr. Galbreath, Dr. Fletes, and Dr. Kagen-Hallet. Neither Dr. Fletes nor his supervisor Dr. Galbreath could arrive at a cause of death after autopsying Chelsea. No toxicological screen was done. Dr. Kagen-Hallet, a neuropathologist (specializes in autopsying the brain), found some scarring on the brain in the area that controls autonomous functions, such as breathing. Based on that, and on the medical history that she had first been given, she arrived at a diagnosis of SIDS—Sudden Infant Death Syndrome, characterized in some of the medical testimony as a "catchall" term used when no

other cause of death can be found. Later, she was given a more complete medical history. She testified that, even without the presence of succinylcholine in the tissue, the more complete medical history would have ruled out SIDS.

Dr. Vincent DiMaio, chief medical examiner for Bexar County, testified that Chelsea did not fit the SIDS pattern because she was too old and that a toxicology screen should always be done before diagnosing SIDS. His opinion was that Chelsea died from succinylcholine, which induced the respiratory and cardiac arrests.

Dr. Angela Clark, a nursing professor at U.T. Austin, reviewed Chelsea's medical records and found numerous "significant" events—Chelsea had been premature and had had hyaline membrane disease, which interferes with breathing, at birth. She diagnosed Chelsea as a "high risk" infant who died from natural causes, as did Dr. Goldie. To counter that testimony, however, is the testimony of Dr. DiMaio and that of Dr. Galbreath. Dr. Galbreath testified that the hyaline membrane disease should have no lasting effect 15 months after birth and after Chelsea's recovery from that disease.

 The medical opinions that death resulted from an injection of succinylcholine and the evidence of the drug in Chelsea's body were sufficient to support the jury finding that Chelsea died from an injection of succinylcholine. The jury was also entitled to give less credibility to testimony based on medical records that were in large part based on appellant's observations when they had evidence that those reports may not have always been very accurate.

Other evidence points to appellant as the one who injected the drug: she knew about the drug and its effects; she was in charge of ordering supplies for Dr. Holland's office; a bottle of Anectine was unaccounted for; the Anectine that was found had been diluted and had unexplained holes in the stopper; appellant suggested just "throwing away" the bottle; when Chelsea visited Dr. Holland the second time, appellant told

Dr. Holland that Chelsea's temperature was below the fever mark when it was actually higher—therefore, Dr. Holland gave appellant permission to give Chelsea "baby shots" which she would not have otherwise done; appellant prepared the syringes outside of anyone else's presence; appellant gave Chelsea the shots. In addition, there was evidence to show intent and motive (discussed under the grounds of error dealing with extraneous offenses).

The evidence is sufficient to exclude every other reasonable hypothesis than appellant caused the death of Chelsea by a criminal act. We overrule appellant's fourth ground of error.

### EXTRANEOUS OFFENSES

Appellant, by grounds of error five through nine, challenges the admission of five extraneous offenses involving seizure episodes similar to that involving Chelsea McClellan: Jimmy Pearson (ground five), Brandy Benites (ground six), Misty Reichenau (ground seven), Rolinda Ruff (ground eight) and Jacob Evans (ground nine). The State offered these offenses on the issues of motive, intent, design or scheme and the jury was instructed to limit its consideration to those purposes. Appellant challenges these offenses on the grounds that they were not proven, regardless of why they were offered. The State's evidence can be summarized as follows: during a one-month period (from August 27, 1982 to September 27, 1982) six children under appellant's care at Dr. Holland's office suffered seven separate instances of "seizures" or respiratory arrest in a town which did not have enough pediatric patients to justify having a pediatric intensive care unit. All of the extraneous offenses will be treated together and presented in chronological order.

The first episode, on August 27, 1982, involved Brandy Benites, an eighteen-month old child taken to Dr. Holland's office for treatment of diarrhea. Brandy's mother testified that while she gave Brandy's medical history to Dr. Holland, appellant took the child out of the room. In a few minutes, Brandy's mother learned that the child had stopped breathing just after appellant prepared and started an I.V. Brandy's mother said that Brandy had never before and never since had an episode in which she stopped breathing.

Brandy was transported by ambulance first to Sid Peterson Hospital and then to San Antonio. Appellant accompanied Brandy in the ambulance. On the way to San Antonio, Brandy again stopped breathing.

Sarah Mauldin, the assistant director of respiratory therapy at Sid Peterson, also accompanied Brandy. She said that appellant had started a second I.V. in Brandy's foot, then she went limp. Ms. Mauldin also said that appellant's medical report of the incident was not completely accurate: the second respiratory arrest in the ambulance was omitted and Brandy's limpness was not described. She also described appellant's behavior as "authoritative, aggressive, hyper." Phillip S. Kneese, a respiratory technician and EMT who was also in the ambulance, described appellant as aggressive and excited.

Dr. Raymond Luna attended Brandy at the pediatric intensive care unit at Santa Rosa Hospital in San Antonio. Over Brandy's five-day period of hospitalization, his testing could find no reason for the two respiratory arrests and all of his metabolic studies were normal.

Jimmy Pearson was brought to Sid Peterson Hospital on August 30, 1982, suffering a cyanotic spell (difficulty in breathing). Unlike the other children, Jimmy was seven and one half years old and did suffer from severe medical problems predating August 1982; tetralogy of Fallot (a heart condition), several physical deformities, and developmental delay which meant that he could not speak. He had cyanotic spells frequently and also suffered seizures. His mother testified, however, that he had never had a respiratory or cardiac arrest before.

On August 30, Dr. Holland decided to transport Jimmy to San Antonio by medical

transport helicopter. Appellant was to accompany Jimmy in the helicopter, along with two paramedics (Sgt. Mayworth and Sgt. Garcia) and the pilot/crew chief (Sgt. Torongeau).

After the flight began, the paramedics hooked Jimmy to a heart monitor. According to the paramedics' testimony, about 15 minutes after the flight started, appellant attempted to listen to Jimmy's heart or chest sounds with a stethoscope, even though that was "impossible" due to the helicopter noise. The heart monitor had not changed before she got up to examine Jimmy. Both paramedics said that they saw appellant make an injection into the I.V. line but did not see her prepare the syringe. Jimmy then suffered a respiratory arrest. The helicopter then made an emergency landing to resuscitate Jimmy.

Both paramedics were surprised that appellant was an L.V.N., as the usual practice for helicopter transport was to send an R.N.

On September 3, 1982, Misty Reichenau, a twenty-one month old, was taken to Dr. Holland's office for treatment of mouth ulcers. Her mother testified that Misty had been a basically healthy child and had no respiratory or seizure problems before visiting Dr. Holland. On arriving at Dr. Holland's office, she, Dr. Holland, and appellant went with Misty to the examining room, where appellant attempted to bend Misty's head. Since appellant had some difficulty in doing so, saying that Misty's neck was stiff, appellant commented that Misty might have meningitis.

Dr. Holland and Misty's mother then left the room to make arrangements to send Misty to the hospital to be tested. When Misty's mother returned, appellant requested that she leave the room, but she refused. Appellant inserted an I.V. that she had prepared. Shortly thereafter, Misty had a "seizure," went limp, and suffered a respiratory arrest. In her mother's words, right before she quit breathing she had a "terrible look in her eyes." Misty was transported to San Antonio. She was hospitalized and examined by a neurologist who found no indication of a seizure. According to her mother, she had no seizures during or after her hospital visit.

Two witnesses described Misty's movements as "seizure-like." Susie Batman, an EMT who had come to the office to transport Misty, described the movements as "seizure-like" and said that the child "relaxed" after Dilantin was administered on Dr. Holland's orders. Debra Sultenfuss, an L.V.N. and friend of appellant, was present during the incident and described the movements as "seizure-like."

On September 17, 1982, Jacob Evans, a five-month old, was taken to Dr. Holland's office because his mother thought he was overly cranky and irritable. When Mrs. Evans arrived, appellant told her that she (appellant) would do a preliminary workup on Jacob until Dr. Holland arrived. Appellant examined Jacob and commented that he had nystagmus (problem with eye movements) which indicated seizure-like activity. Neither his mother or grandmother, who also accompanied him, had noticed any irregular eye activities, nor had Jacob had any seizure problems.

Appellant told Mrs. Evans and Jacob's grandmother to leave the room while she inserted an I.V. They heard Jacob screaming, then a scream cut off abruptly.

Dr. Phillip Webb had a family practice in the same building and assisted in the emergency. He testified that the child was limp and not breathing when he arrived. He saw no signs of seizure and thought the child's condition could be consistent with the administration of succinylcholine.

Dr. Ray Mackey, the same neurosurgeon who examined Misty, made a report that EEG and CAT scan results showed no seizure disorders.

On September 23, 1982, Rolinda Ruff, a five-month old, was taken by her mother to Dr. Holland for treatment of a diarrhea problem. She had no prior or later problems with seizures or breathing. While her mother was discussing treatment with Dr. Holland, appellant took Rolinda to another room to take her temperature. Her mother

thought that she heard Rolinda choking, and, when the door opened, saw her lying limp, with an oxygen mask over her face. Appellant had inserted an I.V. before the child went limp.

Rolinda was transferred to Sid Peterson Hospital. Dr. Harold Bradley, an anesthesiologist, responded to the emergency call upon Rolinda's entry to the hospital. Dr. Bradley had used succinylcholine regularly in the operating room on patients under two years of age. He described Rolinda's movements as being typical of those seen when a child is coming out from under the effect of succinylcholine in the operating room.

The State offered the extraneous offenses for the purpose of showing motive, intent, design, or scheme and the jury was given a limiting instruction to that effect. The State offered, and the court admitted, as an exhibit, a chart illustrating the pattern for this month of seizure episodes. The State points to the following elements as showing a common pattern:

(1) An unexplained seizure or respiratory arrest (with no prior history of such except Jimmy Pearson).

(2) The child could not speak.

(3) The child came in for a potentially serious health problem (*e.g.,* Misty's stiff neck could have been a symptom of meningitis).

(4) Some type of needle was involved, whether for an I.V. or injection.

(5) Appellant either prepared or used the needle.

The general rules on the admissibility of extraneous offenses are well-established:

It is an established general rule of evidence that proof of similar happenings, extraneous transactions or prior specific acts of misconduct committed by a party is irrelevant to the contested material issues in the case on trial and therefore inadmissible.

In a criminal proceeding, when the extraneous or similar transaction committed by the accused, sought to be admitted by the State, constitutes a criminal offense,

introduction of that "extraneous offense" transaction is inherently prejudicial because: (1) the accused is entitled to be tried on the accusation made in the State's charging instrument which specifies the "material issues" of the case and cannot—consistent with the rudiments of due process—be tried for some collateral crime of which he has no notice, *Jones v. State,* 568 S.W.2d 847 (Tex.Cr.App.1978); *Walls v. State,* 548 S.W.2d 38 (Tex.Cr. App.1977); *Young v. State,* 159 Tex. Cr.R. 164, 261 S.W.2d 836 (1953); *Couch v. State,* 155 Tex.Cr.R. 585, 238 S.W.2d 198 (1951); and (2) an accused's "propensity to commit crimes" is not an issue which is material to whether he is guilty of the specified conduct charged by the State; it follows therefore, that introduction of evidence establishing such a propensity constitutes a trial of the accused as a "criminal generally" which offends our system of justice. *Young, supra; Couch, supra; Clements v. State,* 147 Tex.Cr.R. 531, 182 S.W.2d 915 (1944); *see Spivey v. State,* 146 Tex.Cr.R. 11, 171 S.W.2d 140 (1943). *See also Jones, supra; Etchieson v. State,* 574 S.W.2d 753 (Tex.Cr.App.1978); *Cameron v. State,* 530 S.W.2d 841 (Tex.Cr.App.1975); *Albrecht v. State,* 486 S.W.2d 97 (Tex.Cr. App.1972).

Extraneous transactions constituting offenses shown to have been committed by the accused may become admissible upon a showing by the prosecution both that the transaction is relevant to a [contested,] material issue in the case [and that] the relevancy value of the evidence outweighs its inflammatory or prejudicial potential. *Ruiz v. State,* 579 S.W.2d 206 (Tex.Cr.App.1979); *Jones, supra.*

*Murphy v. State,* 587 S.W.2d 718, 721–22 (Tex.Cr.App.1979) (footnotes omitted) (emphases omitted), quoted in *Collazo v. State,* 623 S.W.2d 647 (Tex.Cr.App.1981).

A number of well-recognized exceptions to the rule of non-admissibility exist, however. *Albrecht v. State,* 486 S.W.2d 97 (Tex.Cr.App.1972). Extraneous offenses may be used to show a common

plan or scheme, a systematic course of action or conduct. *Rogers v. State*, 598 S.W.2d 258 (Tex.Cr.App.1980); *Collins v. State*, 548 S.W.2d 368, 376 (Tex.Cr.App. 1976). Evidence to show a common plan or scheme is admissible if the offenses have common distinguishing characteristics which show that there was a common plan or scheme, *i.e.*, that the accused, in the commission of other offenses, followed the same plan or method as is shown to have been followed in the commission of the crime alleged in the indictment. *Plante v. State*, 692 S.W.2d 487 (Tex.Cr.App.1985). Here, the offenses offered showed numerous common elements (as set out above) and showed numerous common elements with the primary offense (Chelsea's case fit all the characteristics set out above). The pattern becomes particularly striking when one considers these incidents all happened in one month, at the same doctor's office, in a town too small to support a pediatric intensive care unit; and where patients were regularly transferred to San Antonio for more sophisticated treatments.

■ Another exception to the extraneous offense rule is when it is offered to show motive. *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr.App.1980), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981). Evidence of motive is particularly important in a case such as this in which a member of the medical profession is charged with murder. The State's theory as to appellant's motive seems to be: (1) she wanted to establish a pediatric intensive care unit at Sid Peterson Hospital and needed to show the necessity for one; (2) she wanted to demonstrate the capabilities of L.V.N.'s.

One witness, Mary Morris, was a nurse at Sid Peterson and visited appellant when appellant was a patient there. Appellant told Ms. Morris that she was there to help start a pediatric intensive care unit; to which Ms. Morris replied that there were not enough cases to justify such a unit. Appellant said, "Oh, they are out there. All you have to do is go and find them." She also told Ms. Morris that the unit would be entirely staffed by L.V.N.'s, which Ms. Morris thought odd.

Frederick Hall, Jr., the hospital administrator, testified that there never had been plans for a pediatric intensive care unit.

Appellant also seemed intent on demonstrating the abilities of L.V.N.'s. She referred to herself as a "pediatric clinician" a term customarily reserved for R.N.'s with specialized training. (Although it was not illegal for her to so describe herself). She was, on several occasions, described by others as thinking that the L.V.N.'s knew more than they were given credit for.

■ Another exception to the extraneous offense rule is that an extraneous offense may be used to illustrate intent where it cannot be inferred from the act. *Crawley v. State*, 513 S.W.2d 62 (Tex.Cr. App.1974) (admissible to show intent or a particular scheme or design used by defendant); *Garcia v. State*, 455 S.W.2d 271 (Tex.Cr.App.1970) (facts and circumstances tended to show intent and system). Here, the pattern of offenses tends to negate the explanation that the incidents were other than deliberate actions on her part and that they were the result of natural causes or negligence.

■ Extraneous offenses may also be used to show the identity of the person committing the offense. *Wintters v. State*, 616 S.W.2d 197 (Tex.Cr.App.1981). Identity was in issue here; appellant argues that the State must prove who injected Chelsea, as well as that Chelsea had been injected. When extraneous offenses are offered to show identity, a high degree of similarity must be shown. *Messenger v. State*, 638 S.W.2d 883, 886 (Tex.Cr.App.1982). The State met that burden in this case. Such similarity may be shown by proximity in time. *Robinson v. State*, 701 S.W.2d 895, 898 (Tex.Cr.App.1985). These incidents all happened within one month. Such similarity may also be shown by a common way of committing the act. *Id.* Here, the offenses all involved needles either prepared by or used by appellant; unexplained sei-

zures and respiratory arrests immediately thereafter.

 Another exception to the rule prohibiting extraneous offenses is to rebut a defensive theory. *Wintters v. State, supra.* Appellant's theory was that Chelsea was a victim of SIDS, with a sensitive nervous system that could have easily stopped breathing from lesser causes than normal children, *i.e.*, death by natural causes. The pattern of offenses tends to rebut this theory. As applied to one child, perhaps natural causes would have been believable—and there was ample testimony concerning Chelsea's medical problems at birth. But, looking at the same types of incidents that all happened within such a short time to six children makes that much less likely.

 These offenses or acts of appellant were clearly not designed nor offered for the prohibited purpose of showing appellant's bad character. *Newman v. State,* 485 S.W.2d 576, 577–78 (Tex.Cr.App.1972). Their probative value outweighed any prejudicial effect. Even testimony that might seem to be overly emotional and inflammatory, such as the "terrible look" in Misty's eyes or Jacob's scream cutting off abruptly has a factual probative purpose. In describing the use and effects of succinylcholine, the medical testimony was that it was usually given after another anesthetic had rendered the patient unconscious because succinylcholine does not induce unconsciousness but simply relaxes all muscles, including those used to breathe. Therefore, a fully-awake person given the drug would be *aware* that he was no longer able to breathe. This is also the significance of *all* of the children being non-talkers—they could not describe their sensations upon recovering. The descriptions of the acts of the children following injections administered by appellant, is probative on the issue because it is consistent with the effect of the injection of succinylcholine. The offenses, when taken together, show a common plan or scheme and rebut the defensive theory of death by natural causes. Under the new Texas Rules of Criminal Evidence, effective September 1986, Rule 404(b) provides that evidence of other crimes, wrongs or acts may be admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." While these rules are not controlling, we believe this rule is a good summary of the reasons why the State used the extraneous transactions. They were properly admitted; we overrule appellant's grounds of error five through nine.

Having overruled all grounds of error, we affirm the judgment of the trial court.